## M. W. KELLOGG CO. et al. v. STANDARD STEEL FABRICATING CO.

## STANDARD STEEL FABRICATING CO. v. M. W. KELLOGG CO. et al.

### Nos. 4188, 4189.

United States Court of Appeals
Tenth Circuit.

June 11, 1951.

Rehearing Denied July 10, 1951.

Huxman, Circuit Judge, dissented.

J. C. Pinkerton, Tulsa, Okl. (Yates A. Land and Richard H. Wills, Jr., Tulsa, Okl., were with him on the brief) for appellants.

John M. Wheeler, Jr., Tulsa, Okl. (Wheeler & Wheeler, Tulsa, Okl., on the brief) for appellee.

Before HUXMAN, MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

This appeal arises out of a breach of contract action, and involves the interpretation of a purchase order contract for the purpose of determining the quantity of fabricated steel the M. W. Kellogg Company agreed to purchase from the Standard Steel Fabricating Company, for use in constructing a fluid catalytic cracking unit for the Texas Company at Tulsa, Oklahoma, and designated as Job 7110.

The purchase order issued by Kellogg to Standard, in words and figures, is as follows:

| "Quantity | Description | Price |
|---|---|---|
| | Enter our order for furnishing the following material: | |
| 1 lot | Steel and connectors for pipe supports in accordance with Drawings furnished and attached three (3) sheets 'Terms of Purchase Order' | |
| | Approximately first 30 tons @ 32c per lb. subject to stipulations on attached three (3) sheets | 19,200.00 |
| | Approximately 95 tons @ 30c per lb. subject to stipulations on attached three (3) sheets | 57,000.00 |
| | Total 125 tons, more or less; Approximately | 76,200.00" |

The attached "Terms of Purchase Order" provide in material part as follows:

"c. Supports marked 'FS' which are to be rod hangers will be furnished by the Vendor, if the Purchaser's Engineering Department deems it advisable. These will be subject to a change to this purchase order to be covered at a later date.

"a. Height of base support upright members will be determined by the Purchaser's Engineering Department and this information will be transmitted to the Vendor by Purchaser."

Completion of Job 7110, according to the drawings and specifications required a little more than 52 tons of steel, and Kellogg refused to purchase any more steel than its requirements for completion of the job. Standard, having been incorporated for the performance of this contract alone, and having purchased the entire 125 tons mentioned in the contract, brought this action for performance or for loss of the profits it would have realized on the undelivered portion of steel.

The issue clearly presented to the trial court and here on appeal, is whether under the terms of the purchase order Kellogg agreed to purchase only the amount of steel required for construction of the fluid catalytic cracking unit, according to specifications and the drawings referred to in the purchase order, or whether it agreed to purchase the 125 ton quantity mentioned in the contract. In short, the question is whether the purchase order is one for a specific and definite quantity of steel or one for the requirements of Job 7110.

Holding that the purchse order was not a requirement contract, but one for 125 tons of steel, with only slight or immaterial variations, and that Kellogg and the Texas Company had breached the contract, the trial court gave judgment for $8,683.72, as loss of profits under the contract.

The ready formula for construction of contracts of this nature was first promulgated in the early case of Brawley v. United States, 96 U.S. 168, 24 L.Ed. 622, involving a contract somewhat similar to ours. Mr. Justice Bradley speaking for the court stated:

"Where a contract is made to sell or furnish certain goods identified by reference to independent circumstances, such as an entire lot deposited in a certain warehouse, or all that may be manufactured by the vendor in a certain establishment, or that may be shipped by his agent or correspondent in certain vessels, and the

quantity is named with the qualification of 'about', or 'more or less', or words of like import, the contract applies to the specific lot; and the naming of the quantity is not regarded as in the nature of a warranty, but only as an estimate of the probable amount, in reference to which good faith is all that is required of the party making it * * *

■ "But when no such independent circumstances are referred to, and the engagement is to furnish goods of a certain quality or character to a certain amount, the quantity specified is material, and governs the contract. The addition of the qualifying words, 'about', 'more or less' and the like, in such cases, is only for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, measure, or weights."

Since the Brawley case, the judicial process has consisted primarily of the application of these rules to particular contracts before the courts. Thus, in Smoot v. United States, 237 U.S. 38, 35 S.Ct. 540, 59 L.Ed. 829, the contract was to furnish 140,200 cubic yards, more or less, of filter sand, to be deposited in twenty-nine filter beds, at $2.65 per yard. Holding that the contract was for the purchaser's requirements, the court stated that the "dominant measure" of the sand to be furnished was what was needed for the filters, and that the cubic feet estimated by the purchaser's engineer was not controlling. See also, Wolff v. Wells, Fargo & Co., 9 Cir., 115 F. 32; Marx v. American Malting Co., 6 Cir., 169 F. 582; Maryland Dredging & Contracting Company v. Coplay Cement Mfg. Co., 265 F. 842; Barkemeyer Grain & Seed Co. v. Hannant, 66 Mont. 120, 213 P. 208; Ruth-Hastings Glass Tube Co. v. Slattery, 266 Pa. 288, 109 A. 695; Annotation 7 A.L.R. 498, supplemented 27 A.L.R. 127. On the other hand, when the only measure is the estimate itself, the courts have allowed only a small variation from the estimate. See United States v. Republic Bag & Paper Co., 2 Cir., 250 F. 79; Norrington v. Wright, 115 U.S. 188, 6 S. Ct. 12, 29 L.Ed. 366; Annotation 7 A.L.R. 498, supplemented 27 A.L.R. 127.

■ This contract is controlled by Oklahoma law, and the Oklahoma Supreme Court in Sherman Machine & Iron Works v. Carey, Lombard, Young & Co., 100 Okl. 29, 227 P. 110, applying the Brawley formula to a contract for 600 barrels "more or less" of cement at a stipulated price, for the construction of a waterworks, held that the contract between the seller and the purchaser was for the amount of cement necessary to complete the purchaser's contract for the construction of the waterworks, and that the 600 barrels mentioned was merely an estimate of what was needed to perform the contract. Paraphrasing the Brawley formula, the court went on to say that where the buyer purchases a specific amount of certain material, to be used for no particular or specific purpose, as where a retail merchant purchases merchandise to be retailed to his customers generally, the quantity specified controls, with slight variations. But, where the purchase is for material to be used for a definite purpose or specific project, all of which facts are made known to the seller, such as a quantity of cement sufficient for the construction of a plant which the purchaser has agreed to build, then the amount of material required to complete the specific project becomes the essence of the contract rather than the specification wherein a certain amount of material is designated, more or less.

The trial court thought our case was more like Budge v. United Smelting & Refining Co., 9 Cir., 104 F. 498, where the contract was to furnish the mining company all mining timbers required and used on its lease during the year. The timbers were to be of certain specified dimensions, and to be delivered at specified places as requested. The mining company agreed to pay specified prices for "about" 600 timbers of a certain dimension, and other prices for "about" 15,000 smaller timbers. The court held that the words "all the mining timbers required and used" did not make the timbers used the measure of quantity, the mining company was required to take and pay for; but, that the mining company was bound to take and pay for the full 600 of one dimension and 15,000 of

the other, where the seller had procured the full quantity and was ready to deliver it. The trial court was impressed by the reasoning of the court in the Budge case to the effect that the determining words of the contract were the definite quantities of timbers specified in the mining company's promise to pay, which it alone knew it would require. In that case, however, the court was careful to observe that the contracting parties "[did not have] in mind the construction of a particular work, and the supply of the necessary material therefor; the work itself furnishing to both parties the ultimate measure of the quantity which the contract contemplated."

The trial court found that the appellee did not know, and could not ascertain, the amount of steel necessary except by reference to the tonnage specified in the contract; that the appellants alone knew the amount of steel they wanted, and stipulated 30 tons at 32c per pound and 95 tons at 30c per pound. But, the court also found, and it is admitted, that at the time this contract was entered into, the appellee was furnished with the pipe and structural steel drawings for Job 7110, and that the catalytic cracking unit was constructed according to such plans without any changes or variations. The drawings specified a definite weight of scheduled items, but gave only typical design without number, size or weight of unscheduled items. The court also found, and it is undisputed, that Kellogg was not interested in buying more steel than it needed to construct the plant, nor was the Texas Company interested in acquiring an inventory beyond the immediate needs for the specific job; that the appellants desired only to purchase the steel required for the construction of the plant, and Standard knew they wanted only the steel necessary for that job.

■ To us, it is manifest that neither Kellogg nor Standard knew with any degree of certainty the tonnage of steel that would be required to construct the catalytic cracking unit. The tonnage could have been estimated only after intensive study of the drawings and specifications. Ogilvie, President of Standard, could only find 50 tons of steel from a "takeoff" of the drawings. Knight, of the Kellogg Company, thought it would take 125 tons and based his estimate in part on the unscheduled items and other requirements contemplated, but not specifically calculated, under the terms of the purchase order. But in any event, the estimate of tonnage was little more than a guess. The wide divergence in the estimate and the requirements is unexplained, but there is no allegation or proof of bad faith on the part of Kellogg as to the amount of steel it used. One thing seems certain, the parties contracted for a sufficient quantity of steel to construct a specific job according to the drawings and specifications, which apparently neither party took the pains to translate into definite tonnage. The dominant measure of quantity under the contract was the needs of the purchasers, and we hold that they were not bound to take more. It thus becomes unnecessary to consider the points raised in the cross-appeals.

The judgment is reversed with directions to enter judgment in favor of The M. W. Kellogg Company and the Texas Company.

HUXMAN, Circuit Judge (dissenting).

I find myself unable to concur in the opinion of the majority. There is no disagreement between us as to the applicable principles of law. The difficulty, as always, comes when we seek to apply recognized principles of law to a given state of fact. The trial court's findings, in my view, are supported by substantial evidence and its conclusions of law based thereon are correct. I am, therefore, forced to the conclusion that the judgment should be affirmed.

The definition in Brawley v. United States, 96 U.S. 168, 24 L.Ed. 622, is the generally accepted definition of what constitutes a requirement contract, but the results, when applying it to facts seemingly indistinguishable, are not always reconcilable. In the Brawley case the contractor agreed to furnish 880 cords of wood for Fort Pembina, more or less, as was to be determined necessary by the post commander. Only 40 cords were accepted. The court construed the contract to be a requirement contract and that the words

"880 cords more or less" were only an estimate of the needs and were not controlling in the absence of bad faith. But in Budge v. United States Smelting and Refining Co., 9 Cir., 104 F. 498, 500, a contractor agreed to furnish a mining company "all mining timbers required and used" in its mines during a year. The contract then specified the prices for delivery at Tunnels 2, 3 and 8 and then contained this phrase, "about fifteen thousand." The court held that this was not a requirement contract and that the estimate of 15,000 timbers controlled.

There is this distinction between the cases relied on by the majority and the case before us. In all those cases the court had before it only the contract unsupported by any other writing, conversations or circumstances. In our case the purchase order had attached the terms of purchase order. The blue prints, drawings and specifications were also furnished. There was also a number of conversations immediately preceding the execution of the contract and shortly after its execution between the parties to this litigation with respect to their interpretation of the contract.

It was strenuously argued by appellant before us that from the blue prints and drawings could be ascertained and determined the amount of steel required for all scheduled items. It is of some significance in seeking to ascertain the intent of the parties that it is conceded that it would require a matter of weeks to glean this information from the drawings and specifications. These drawings were furnished only a day or so before the contract was executed.

It is also without dispute that the blue prints contained scheduled and unscheduled items. The purchase order also provided that appellant had the right to change some of the listed items and that information of any proposed change would be furnished at a later date. The purchase order also provided that the height of the listed base support upright members would be determined by appellant's Engineering Department and that information of such changes would be then furnished to appellee. It is thus clear that appellee could not have ascertained from the drawings and the blue prints the amount of steel required for fulfilment of the contract. Appellee owned no steel. It was required to purchase on the market the steel required to fulfil its commitments under the contract. It was not interested in acquiring steel beyond such needs; neither was appellant interested in purchasing more steel than was needed for this plant. This was not a case in which appellee had agreed to satisfy appellant's needs from a stock pile of goods on hand. Both parties were dealing with respect to the specific requirements of a particular job. Thus considered, the estimate of 125 tons of steel takes on special significance.

That the parties did not consider this to be a requirement contract is also supported by their conversations respecting the contract immediately preceding its execution and shortly thereafter. Ogilvie, the president of appellee, testified that in a number of conversations preceding the execution of the contract, he was informed by Mr. Knight, the engineer for appellant, that a minimum of 125 tons of steel would be required and that, when he subsequently told Mr. Knight that he was unable to find more than from 45 to 60 tons; that he was informed that the balance of the steel would be taken up in unscheduled items and in additional requirements for the contract. He testified that Knight told him that there would be a minimum of 125 tons of steel. In my view, he had a right to rely upon these statements. The trial court no doubt placed reliance on this testimony in concluding that the contract was not a requirement contract.

This line of testimony was properly received in construing the contract and seeking to determine the intent of the parties. The law is well settled that in construing contracts, the acts, conduct and conversations of the parties at the time of the transaction are pertinent and should be considered in ascertaining their intent and the meaning to be ascribed to a contract

that is not clear and free from doubt.[1] Contracts worded as is that contract are not so clear and free from doubt as to make inappropriate a consideration of the circumstances, conversations and conduct of the parties with respect to their real intent. So considered, I agree with the trial court that the contract was one for the delivery of approximately 125 tons of steel and was not a requirement contract.

1. Brawley v. United States, 96 U.S. 168, 24 L.Ed. 622; Wolff v. Wells, Fargo & Co., 9 Cir., 115 F. 32; Marx v. American Malting Co., 6 Cir., 169 F. 582; McDowell v. Droz, 179 Okl. 119, 64 P.2d 1210; Washoma Petroleum Co. v. Eason Oil Co., 173 Okl. 430, 49 P.2d 709.