**UTAH INTERNATIONAL, INC., a corporation, Plaintiff,**

v.

**COLORADO–UTE ELECTRIC ASSOCIATION, INC., a corporation, et al., Defendants.**

Civ. A. 75–A–526.

United States District Court, D. Colorado.

Dec. 14, 1976.

Pillsbury, Madison & Sutro by Allan N. Littman, James F. Kirkham and D. Peter Harvey, San Francisco, Cal., and Welborn, Dufford, Cook & Brown by Philip G. Dufford and Joseph E. Cook, Denver, Colo., for plaintiff.

Holme, Roberts & Owen by Peter H. Holme, Jr., A. Edgar Benton, John L. Kane, Jr., and John R. Webb, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

ARRAJ, District Judge.

Plaintiff Utah International, a mining company with international operations, brings this declaratory judgment action against Colorado-Ute Electric Association, Inc., Platte River Power Authority, Tri-State Generation and Transmission Association, and Salt River Project Agriculture Improvement and Power District, all wholesalers of electric power and energy. Plaintiff seeks a declaration of its rights and duties as a party to a contract for the sale of coal, and defendants have counterclaimed for the specific performance of that contract.

The contract in question is a thirty five year requirements contract containing a maximum sales obligation and minimum purchase obligation. Plaintiff as seller claims that defendants have breached the contract by building electric generating units with generating capacities larger than specified in the sales contract. As a result of such construction, plaintiff contends that it will be required to provide more coal than was anticipated by this requirements contract and that its contractual obligations thereunder should, therefore, be terminated. Trial was to the Court and this Opinion shall constitute the findings of facts and conclusions of law in conformance with Fed.R.Civ.P. 52(a).

In 1969, the four defendants, along with Public Service Company of Colorado, Intermountain Consumers Power Association, and Arizona Public Service formed the Western Colorado Resource Study to consider the possibility of constructing coal-

fired electric generating units near Craig, Colorado. This project later became known as the Yampa Project. These original participants appointed a Steering Committee to be in overall charge of the project, the membership consisting of senior executives of each defendant and representatives of the United States Bureau of Reclamation. This committee in turn created a task force system to carry out specific study assignments.

On April 13, 1970 the participants· commenced negotiations with plaintiff for the supply of fuel for the Yampa Project and sent to plaintiff, and to other prospective suppliers an invitation to submit proposals for the mining and delivery of coal fuel. The amount of coal contemplated as necessary to fuel the project was at that time undetermined but the participants provided coal consumption estimates for the different unit alternatives then being considered. In response, plaintiff proposed a pricing schedule based on calculations made from the estimated coal consumption figures provided by defendants in their invitation.

In December of 1970, defendant Salt River, as the participant in charge of the initial purchase negotiations for the project's turbine-generators, obtained a quotation from General Electric for two 450,000 kilowatt generators. In March of the following year, Salt River and General Electric executed a letter of intent for these generators with the stipulation that the size of the units could subsequently be changed.

By early 1971 Public Service Company of Colorado, Intermountain Consumers Power Association, and Arizona Public Service Company had withdrawn from the Western Colorado Resource Study leaving the defendants as the remaining participants. As a result of that withdrawal the participants began re-evaluating their projected consumer power demands and their plans regarding the size of the generating units to be constructed. By December of 1971 they had decided that two units, each rated at 350,000 kilowatts net, would be capable of providing the generating capacity necessary to meet their re-evaluated projections.

In choosing the machine to meet their needs, defendants operated under certain assumptions generally accepted by the electrical generating industry. The first and most important assumption is that a generating unit of the type being installed at Craig will not operate at 100% capacity but rather at approximately 75% capacity over an extended period, such as the thirty five year term of this contract. The reason for this is that all such machines require regularly scheduled maintenance periods and also periods of unanticipated maintenance during which it is necessary to shut down the machines.

Once the unit size was chosen, the parties then calculated the amount of coal that such units would burn over thirty five years. This process was a joint effort between representatives of the defendants and representatives of the plaintiff. Both parties used the net figure 350,000 kilowatts as a starting point in estimating the probable coal consumption and then communicated their calculations to the other party for verification. Gradually, through this process, the estimates became refined, and both parties as of May of 1972 understood that there would be constructed two generators of approximately 350,000 kilowatt net capacity each, which machines would operate at an average capacity factor of about 75% and would burn approximately 76 million tons of coal over the life of the contract. It was additionally understood that the generating units would operate at almost 90% capacity during the first ten years of the contract and then steadily decline in capacity during the balance of the term of the contract. The parties expected some variance from these predicted capacity factors and these predictions for coal consumption but there was no suggestion that it was expected by either party that the variance would be substantial.

It is clear that the generating unit size and the coal consumption calculations derived from the customary operation of such units were important to plaintiff during the negotiations of this contract. Plaintiff relied on the calculations in conducting its

feasibility study, developing a pricing schedule, and designing its mine. Defendants were aware that plaintiff was so utilizing these figures. It is noted that defendants' expert witness testified to the effect that it is a common procedure in the negotiation of such a fuel contract for the public utility or other buyer of coal to calculate the amount of coal expected to be burned and then to communicate such calculations to the coal miner.

Negotiations between defendants and plaintiff were completed by February 3, 1973 and the contract in question was signed April 6, 1973. The contract provides that plaintiff's obligation is to supply the coal requirements for two generating units, each with a capacity of about 350,000 kilowatts net. Plaintiff's sales obligation, however, is not to exceed the mining and delivery of coal sufficient to produce 1830 trillion Btu's over the thirty five year life of the contract. Defendants' purchase obligation is to pay for a yearly quantity of coal, regardless of whether they order that amount. This quantity is a negotiated figure based on a calculation of 85% of the expected coal consumption of the machines. Between these maximum and minimum limits, the contract provides that the actual requirements of the units is to be determinative of the amount of coal ordered and delivered.

It is noted that shortly after the execution of the contract, coal prices began to rise dramatically, due in part to the Arab oil embargo in September of 1973. Prior to that time the price of coal had reflected only a slight upward trend.

Presumably these negotiations and the resulting contract would not have reached this court had the defendants not made two significant decisions in February of 1973 and prior to the execution of the contract. One decision was to build units with a net capacity of 410,000 kilowatts each instead of the 350,000 net capacity specified in the contract. The other decision was to refrain from communicating to plaintiff any information regarding this increase—at least until some undetermined future date.

Defendants recognized that such an increase in unit capacity, if communicated to plaintiff when the decisions were made, might adversely affect the then status of the contract negotiations. The fuel contract was signed by the parties before the increased size of the units was revealed and at the time of trial, defendants had completed a substantial portion of the construction of these larger sized units.

Plaintiff and defendants draw different conclusions from these facts. Plaintiff contends that the size of the units to be constructed, the "about 350,000 kilowatts" net size described in the contract, was the essential condition of the contract and that defendants abrogated the entire contract by building units of a size larger than that described. Defendants on the other hand, contend that neither the size of the units nor the calculations of estimated coal consumption were essential to this contract and that they should not have been relied upon by plaintiff in its pricing and in its mine design. Defendants assert rather that the maximum and minimum amounts contained in the contract define the obligations of the plaintiff and that construction of units larger than those described in the contract was not, therefore, in breach of the contract. Neither view accurately reflects the evidence nor the controlling law.

## I

Both parties to this litigation recognize that the contract in question is a requirements contract, As such, it requires that plaintiff provide and defendants purchase the fuel necessary to operate the generating units described in the contract. It is not, however, a pure requirements contract, but one modified by the maximum seller's obligation and the minimum buyer's obligation. It is necessary to this litigation to understand the legal significance of these modifications.

From my reading of the contract, it is clear that one of the effects of the minimum purchase obligation is that plaintiff mine company may at all times require that the defendant utility companies take or pay

for the contractual minimum amount of coal regardless of the actual fuel requirements of the generating units. Testimony at trial disclosed that the parties to the contract likewise understand the contract to impose such an obligation on the buyer. There is no suggestion that the defendant purchasers can avoid this obligation, for example, by shutting down their plant or by limiting its operation, even if such a decision is motivated by sound business management.

Such a purchase obligation is a protective provision for the seller and as such eliminates some of the risks for seller which normally attend the type of requirements contract containing no such minimum purchase obligation. Expert testimony at trial indicated that this type of minimum purchase obligation is becoming a more common feature in coal sales agreements such as the one here in dispute.

■ Since defendants are thus obligated to purchase a minimum amount of coal, regardless of the actual generating requirements of the units specified in the contract, it follows, in my view, that defendants have the concomitant right to demand delivery of that minimum amount regardless of their actual fuel requirements. The few cases that have dealt with such requirements contracts, all containing similar minimum purchase obligations, have almost unanimously reasoned as we have and have held that the absolute *obligation* to buy a minimum amount necessarily implies the absolute *right* to buy that amount, and that buyer, in demanding delivery of its minimum purchase obligation need not be motivated by the business requirements envisioned by the contract but may, in fact, utilize the commodity completely apart from the operation of the business specified in the contract. *See Magnolia Petroleum Co. v. Farmersville Independent Gin Co.,* 243 S.W. 568 (Tex.Civ.App.1922); *Corsicana Compress Co. v. Magnolia Petroleum Co.,* 253 S.W. 559 (Tex.Civ.App.1923); and *Diamond Alkali Co. v. Aetna Explosives Co.,* 264 Pa. 304, 107 A. 711 (1919).

In contrast to the minimum purchase obligation in this contract, the purchase of coal in excess of the contractual minimum is controlled by and dependent upon the actual requirements of the defendants and may be demanded pursuant to those requirements up to the maximum sales limit contained in the contract. More specifically, it is my reading of the contract that it does not give the defendants the right to demand delivery of the contract maximum unless that demand is justified as being required for the actual operation of the two 350,000 kilowatt net machines specified in the contract.

The nature of the negotiations leading up to the execution of this contract is consistent with such an interpretation. All parties recognized that the anticipated unit size was crucial in estimating probable coal consumption and that such estimates were significant to all parties in developing their bargaining positions. Such negotiations would have been meaningless if the parties had not contemplated that the fuel requirements of the generating units would define the purchase and sale obligations above the minimum.

Indeed, since plaintiff and defendants both characterize the contract as a requirements contract it would seem that neither would disagree with this construction of the contract. Both parties have cited the case of *M. W. Kellogg Co. v. Standard Steel Fabricating Co.,* 189 F.2d 629 (10th Cir. 1951) for the proposition that in a requirements contract, the project itself, and the material required to finish that project becomes "the essence of the contract . ." 189 F.2d at 631. Nevertheless, the defendants assert that they have an absolute right to the maximum amount of coal specified in the contract regardless of their actual requirements. Such an assertion is simply not consistent with defendants' own characterization of the contract as being a requirements contract.

Careful consideration has been given to *Diamond Alkali Co., supra,* cited by defendants for the proposition that a buyer in a requirements contract can demand the

maximum purchase amount of the contract whether or not it was required in its business. In that case, the contract provided that the seller was obligated to furnish soda ash at a fixed price to the extent of "buyer's entire requirements" within certain maximum and minimum sales limits. The price of soda ash apparently rose and the buyer took advantage of the low contractual price by purchasing in excess of its business requirements and reselling on the open market. The court stated that such transactions did not violate the parties' contract and did not obligate the purchaser to account to the seller for his resale profits. This holding, however, is no more logically consistent than is the position of the defendants in the instant case, in that it also fails to reconcile its conclusion with the fact that the contract was a requirements contract and was so characterized by that court. The opinion does state that the contract was vague as to what purchase requirements were anticipated by the parties to the contract since the nature of the buyer's business could not be detected from the contractual terms. Therefore, the court in *Diamond Alkali Co.* might have viewed the obligations differently had the anticipated purchase requirements been more specifically described in that contract as they are so described in the contract at issue in the instant case.

At any rate, the weight of authority is contrary to this case and to defendants' position. The court in *Staver Carriage Co. v. Park Steel Co.*, 104 F. 200 (7th Cir. 1900) held that any deliveries above the minimum limit in a requirements contract could be demanded only to the extent of the actual business requirements of the purchaser, as those business requirements were contemplated by the parties to the contract. Likewise in *Magnolia Petroleum Co., supra*, the court held that all deliveries in excess of the contractual minimum must be justified by the business requirements of the purchaser.

Finally, in *National Home Products Co. Inc. v. Union Carbide and Carbon Corp.*, 281 App.Div. 604, 121 N.Y.S.2d 130 (1953), aff. 306 N.Y. 638, 116 N.E.2d 245 (1953) the court held that minimum and maximum limits in a requirements contract do not transform such a contract into a contract for the sale of a definite quantity. Instead, the court held that such a contract is still a requirements contract obligating the seller to provide the materials necessary to meet the buyer's operational necessities in the business specified by the contract. Unless the contract were given such an interpretation, the court felt that "the 'requirements' provisions of the contracts would seem to be mere surplusage and meaningless." 121 N.Y.S.2d at 132.[1]

It is, therefore, my view that the proper construction of the contract here in question is one that acknowledges the buyer's absolute obligation and its concomitant absolute right to purchase the contract minimum. Additionally, purchases in excess of the minimum limit but less than the maximum must be provided by seller only insofar as they are required by buyer's business operations, as those operations are described in the contract.

We now turn to the question of whether defendants have altered such rights and duties under this contract by departing from the terms of the contract with their construction of generators larger than those specified in the contract.

## II

Plaintiff contends that the defendants have abrogated this contract by building generator units substantially larger than anticipated by the parties and larger than specified in the contract. We turn to Colorado law regarding rescission in evaluating this claim.

■ Under Colorado law, a breach of a contract will not terminate a contract and

---

1. This is the only case we have found that also holds that the minimum purchase limit in a requirements contract can not be demanded unless it is likewise necessary for the actual business operations of the purchaser. I do not agree with this interpretation of the minimum purchase obligation for the reasons discussed *supra*. It is also noted that this aspect of the court's opinion has been criticized unfavorably. *See* 54 Colum.L.Rev. 296 (1954).

relieve the other party of its duties thereunder unless that breach is a major breach going to the essential condition of the contract. *Gulick v. A. Robert Strawn & Associates*, 477 P.2d 489 (Colo.App.1970). Furthermore, the party seeking rescission must show that the injury caused by the breach is irreparable and that more than a mere variance of the contract terms is involved. *Kole v. Parker Yale Development Company*, 536 P.2d 848 (Colo.App.1975); *Briggs v. Robinson*, 82 Colo. 1, 256 P. 639 (1927).

■ Colorado law is clear in its requirement that a court exercise caution in terminating a contract. It is widely held, and Colorado is no exception, that forfeitures pursuant to a forfeiture provision in a contract are not looked upon with favor and will be avoided if possible. *Moorman Manufacturing Co. v. Rivera*, 155 Colo. 413, 395 P.2d 4 (1964). *Gulick, supra*, points out that declaring a contract terminated because of a breach in performance is tantamount to declaring such a forfeiture and, therefore, the same caution exercised in declaring a forfeiture was held to be required in terminating a contract. This court has likewise recognized this policy of avoiding contractual forfeitures, *United Buckingham Freight Lines v. Riss & Company*, 241 F.Supp. 861 (D.Colo.1965), and concludes as the court did in *Gulick* that terminating a contract upon breach of that contract and in the absence of a forfeiture provision should *a fortiori* be avoided if possible.

■ I recognize that Colorado law generally requires a court to rescind the whole contract and not to affirm or disaffirm the contract in part. *Kelley v. Silver State Savings and Loan Ass'n*, 534 P.2d 326 (Colo.App.1975); *Tomkins v. Tomkins*, 78 Colo. 574, 243 P. 632 (1926); *Walker v. MacMillan*, 62 Colo. 136, 160 P. 1062 (1916). The Colorado courts, however, have not addressed the question of the partial cancellation of a contract containing separate and divisible obligations. Since that issue is presented by this dispute this court must attempt to predict how a Colorado court would rule if faced with the question of the partial rescission of such a contract. Two facts lead me to believe that Colorado would grant the partial rescission of a divisible contract if the equities require it.

First, the Colorado Supreme Court has held that a court of equity, when declaring the rights and duties under a contract, "should make such adjustment of the case as the facts pleaded and proved will justify." *Cahill v. Readon*, 85 Colo. 9, 15, 273 P. 653, 656 (1928). Such a holding thereby acknowledges that the court in an equitable action must have the necessary flexibility to make a disposition consistent with whatever the equitable requirements of the case may be.

Second, the law from jurisdictions outside Colorado clearly allows the partial rescission of a divisible contract if justice so requires. *See* for example *Reina v. Erassarrett*, 90 Cal.App.2d 418, 203 P.2d 72 (1949); *Mitzel v. Schatz*, 175 N.W.2d 659 (N.D.Sup.Ct.1970); *Thompson v. Williams*, 246 S.W.2d 506 (Tex.Civ.App.1952). *See also* annotation at 148 A.L.R. 417 (1944). I therefore conclude that the partial rescission of a divisible contract would not be inconsistent with Colorado law if such were required for an equitable resolution of a contractual conflict.

■ In applying the above discussed legal principles to the contract here in question, I find that the contract is divisible in the obligations it imposes on the parties. As pointed out in the previous section, the contract contains an absolute minimum purchase obligation and a requirements purchase obligation for purchases in excess of the minimum. These obligations operate independently of each other and impose obligations of significantly different natures.

I further conclude that the Colorado law governing the possible grounds for rescission justifies the cancelling of only a portion of this contract and that the equities of this case demands such partial rescission. The minimum purchase obligation in this contract, as an absolute obligation, is not influenced by defendants' fuel requirements and is, therefore, equally unaffected by the unit size chosen by defendants. It follows,

therefore, that the generating capacities of the units were not a major factor in either establishing this obligation or in negotiating the particular extent of the obligation. Therefore, even though defendants have breached this contract by constructing larger generating units than specified in the contract, that breach does not go to the essential condition of the contract's minimum purchase obligation. Therefore, under Colorado's stringent rules governing the termination of a contract, defendants' breach does not justify cancelling that portion of the contract.

This breach of performance by defendants, however, does go to the heart of the requirements purchase obligation for amounts of coal in excess of the minimum. As this court concluded above, defendants are entitled to receive coal in amounts in excess of their minimum purchase obligation only if that coal is required by the operation of the generating units specified in the contract. Therefore, in construing this portion of the contract it becomes apparent that the size of the coal consuming units is the essential element in determining the parties' rights and duties thereunder. The contract specified that the generating units would have net capacities of about 350,000 kilowatts each. Defendants, however, are building units with capacities of 410,000 kilowatts net. This increase in size will result in the consumption of an amount of coal substantially in excess of the amount contemplated by plaintiff and in excess of the coal consumption calculations prepared and relied on by both parties during the negotiation of the contract. Defendants should not be allowed to take advantage of this breach, particularly in view of the continuing dramatic rise in the price of coal; this breach is of such a nature as to require rescission of that portion of the contract. Certainly the breach is more than a mere variance of the contractual terms and in it threatens to do irreparable damage to plaintiff. See *Briggs* and *Kole*, *supra*.

Defendants, however, point to the rule of law allowing the purchaser in a requirements contract to modify his business operations after the contract is signed and cite *Southwest Natural Gas Co. v. Oklahoma Portland C. Co.*, 102 F.2d 630 (10th Cir. 1939) as authority for that rule. Defendants' reliance on that case is misplaced and entirely inappropriate.

In the case at bar, the purchaser's business requirements specified in the contract were modified prior to the execution of the contract and without notifying plaintiff. In *Southwest*, the improvements made in the business operation of the purchaser were made subsequently to the execution of the contract and were the type of improvements that seller should have anticipated would occur over the life of that contract.

The court in *Southwest* also pointed out that the changes made in purchaser's business were not precluded by the terms of the contract. Defendants in the instant case, however, have made a modification prohibited by the terms of the contract in that the contract specifically stipulates the size of the generating units that were to be built.

Additionally, *Southwest* emphasizes that the modifications were made in good faith and were necessary for the continued efficiency of the purchaser's plant. Defendants' in this action have failed to meet the burden of establishing that their changing the size of the consuming generating units was in good faith. In fact, the evidence strongly suggests to the contrary.

As noted above, this court is aware of the caution that must be exercised in terminating any contractual obligation. The case at bar, however, clearly presents a situation where such an equitable remedy is the only appropriate remedy. A party to a contract may not unilaterally alter the obligations of any of the parties to that contract. Defendants, however, have attempted to increase plaintiff's sales obligation under the requirements portion of this contract by altering their business operations in such a manner as to constitute a material breach of that portion of the contract. Rescission, therefore, is an appropriate remedy. As pointed out, however, the breach does not affect that portion of the contract contain-

ing the defendants' minimum purchase obligation and as such, prohibits the termination of that obligation. It is therefore,

ORDERED that

1) Plaintiff must yearly sell to defendants, if defendants so demand, that amount of fuel specified in the "Table for the Minimum Annual Payments" contained in Section 8 of the Craig Station Fuel Agreement, a portion of which is attached hereto as Appendix A.

2) Defendants may purchase, regardless of their operational requirements, that amount of fuel specified in that same Table for Minimum Annual Payments contained in Section 8 of the Craig Station Fuel Agreement.

3) Defendants must make the minimum yearly payments pursuant to the provisions of Section 8 of the Craig Station Fuel Agreement regardless of whether defendants actually receive any coal during that year.

4) Plaintiff is not obligated to furnish to defendants any coal in excess of the above prescribed amounts unless pursuant to a new or supplemental agreement between the plaintiff and defendants.

5) All other provisions of the Craig Station Fuel Agreement, including but not limited to those provisions regarding price, delivery schedules, arbitration, the term of the contract and emergency storage shall remain binding on plaintiff and defendants except insofar as they are modified by this order.

Each party shall pay its own costs.

### APPENDIX A

8.2 *Amount of Minimum Annual Payment*

For each calendar year during the term of this agreement Buyers shall pay to Seller a minimum amount of money, computed by multiplying the amount of fuel shown in the column entitled "Standard Annual Btu Consumption" in the table set forth below, for such year, by the arithmetic average of the final escalated base price for each of the calendar months during such year following the commencement of fuel deliveries under this agreement (each such escalated base price to be the base price set forth in Section 6 as escalated pursuant to Section 7). It should be noted that figures in the "Standard Annual Btu Consumption" column are agreed figures for the purpose of computing minimum annual payments and are only 85% of the estimated fuel consumption.

Table for Minimum Annual Payments

| Calendar Year | Standard Annual Btu Consumption in Trillions ($10^{12}$) of Btu |
|---|---|
| 1977 | 7.344 |
| 1978 | 26.333 |
| 1979 through 1988 | 44.455 |
| 1989 | 42.466 |
| 1990 through 1993 | 40.494 |
| 1994 | 38.522 |
| 1995 through 1998 | 36.550 |
| 1999 | 34.578 |
| 2000 through 2003 | 32.589 |
| 2004 | 30.617 |
| 2005 and each year thereafter | 28.645 |