**TENNESSEE VALLEY AUTHORITY**

v.

**IMPERIAL PROFESSIONAL COATINGS.**

**No. Civ. 3–84–239.**

United States District Court,
E.D. Tennessee, N.D.

Aug. 20, 1984.

Herbert S. Sanger, Jr., Gen. Counsel, James E. Fox, Associate Gen. Counsel, Peter K. Shea, Richard B. Campbell, Tennessee Valley Authority, Knoxville, Tenn., for plaintiff.

Henri Wolbrette, III, McGlinchey, Stafford, Mintz, Cellini & Lang, Kathleen A. Manning, New Orleans, La., James A. Ridley, III, Kramer, Johnson, Rayson,

McVeigh & Leake, Knoxville, Tenn., for respondent.

## MEMORANDUM

HULL, District Judge.

This is an action for judicial review of a decision by the Tennessee Valley Authority [TVA] Board of Contract Appeals [Board] rendered pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 607(g) (Supp.1984). The Board held that under the Changes Clause of a requirements contract between Imperial Professional Coatings [IPC] and TVA for paint to coat concrete at proposed nuclear power plants, IPC was entitled to an equitable adjustment[1] when TVA ceased to have requirements for the paint after it decided to cancel construction of the plants. The case is before the Court on cross-motions for summary judgment.

 In this case, federal law governs the contract rights and obligations of TVA. *Tennessee Valley Authority v. U.S. Carbon Products, Inc.,* 427 F.Supp. 474, 477 (E.D.Il.1976); *Tennessee Valley Authority v. Mason Coal, Inc.,* 384 F.Supp. 1107, 1115 (E.D.Tenn.1974) *aff'd.* 513 F.2d 632 (1975). The decision of the Board is final and conclusive on questions of fact and shall not be set aside unless clearly erroneous, but is not final and conclusive on questions of law. 41 U.S.C. § 609(b).

The facts of the case are agreed on by the parties, are accurately set forth in the Board's decision, and will be only briefly recited. In 1978, pursuant to a bid, TVA awarded to IPC a contract to supply protective coating paint for proposed nuclear reactors. The estimated amount of the contract was $2,717,426.79, as reflecting the estimated amount of materials and surfaces to receive the protective coatings at the prices specified by IPC. In early 1982 TVA deferred construction of the nuclear plants. The decision to defer construction presumably was made on the basis that anticipated growth in the demand for electric power had been overestimated. (Letter to IPC from C.H. Strickland, August 6,

---

**1.** The amount of damages, if any, was not be- fore the Board and is not before this Court.

1982). Prior to deferral of construction activities by TVA, TVA had ordered and IPC had shipped approximately $1,414,-000.00 worth of the paint. After TVA notified IPC that no further orders would be placed, IPC filed a claim with the TVA contracting officer. The contracting officer held that the contract was a requirements contract and that TVA had no obligation to order more than its requirements. IPC appealed the decision to the Board which held that cancellation of the plants was unforeseen by either party, that IPC did not assume the risk of cancellation, and that IPC was entitled to an equitable adjustment under the Changes Clause of the contract.

The parties do not dispute that this is a requirements contract or that TVA made a good-faith decision to cease construction of the nuclear power plants, thereby terminating its requirement for paint. The dispute centers on whether IPC is entitled to an equitable adjustment on the theory that TVA's decision to cease construction was a change within the changes clause of the contract.

The pertinent contract provisions are set forth below:

"*Quantity*. This is a requirement contract for the materials which are required for painting the areas designated in the invitation to bid, Hartsville Nuclear Plants A and B, and Phipps Bend Nuclear Plant which is expected, but not guaranteed, to be completed about first quarter 1986. The area stated is TVA's estimated area, and the quantity is the theoretical quantity for estimated areas for the term of this contract; however, TVA does not guarantee to purchase any *maximum or minimum* amount as TVA's actual requirements may differ from the TVA estimate. Any quantity for which TVA has not requested delivery as of the date of completion of painting of the designated area of each plant is automatically cancelled.

"*Changes*. The Contracting Officer may at any time, by written order, and without notice to the sureties, make changes in the work within the general scope of the contract, including changes in the drawings and specifications. If such changes cause an increase or decrease in the amount of work under this contract or in the time necessary for its performance, an equitable adjustment will be made in the price or the time allowed for performance, or both, and the contract shall be modified in writing accordingly....

IPC's position is that: (1) The requirements contract provides an objective measurable standard (the designated areas described and measured in the invitation to bid) for what is required, and specifically provides for equitable adjustment if that standard is changed, such as by a decision to cancel the plants.

(2) Neither party foresaw or contemplated a cancellation of the project and the facts and circumstances surrounding the contract indicate the parties did not intend for IPC to assume the risk of cancellation.

TVA's position is that: (1) Because this is a requirements contract it obligated itself to purchase whatever its requirements proved to be and that IPC assumed the risk of a decrease or cessation of requirements caused by TVA's good-faith decision to cancel the plants.

(2) A decrease in requirements caused by cancellation of the plants is not a change compensable under the changes clause.

A requirements contract is " 'a contract in which the purchaser agrees to buy all of its needs of a specified material from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract.' " *Mason v.. United States*, 615 F.2d 1343, 1346, 222 Ct.Cl. 436 (1980), *quoting Media Press, Inc. v. United States*, 566 F.2d 1192, 215 Ct.Cl. 985 (1977). The purpose of a requirements contract is to give the buyer an assured source of supply over an extended period of time without obliging him to purchase a specified quantity, thus enabling him to meet the fluctuating needs of his business. Note, *Requirements Contracts: Problems of Drafting and Construction*, 78 Harv.L.Rev. 1212, 1215 (1965). In light

of this purpose, courts have generally permitted a buyer to cut back or eliminate entirely his orders if there is a bona fide decrease in needs. *Id.; Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp.,* 130 F.2d 471 (3rd Cir.1942); *In re United Cigar Stores,* 72 F.2d 673 (2d Cir.1934), *cert. den. sub nom.* 293 U.S. 617, 55 S.Ct. 210, 79 L.Ed. 706 (1934).

With these general principles in mind, the Court will address IPC's argument that although the contract at issue is a requirements contract for paint for nuclear plants and TVA's requirement for the paint ceased with the good-faith cancellation of the plants, IPC is entitled under the contract to an equitable adjustment.

 The essence of this dispute is whether IPC assumed the risk of a good-faith decision to cancel the nuclear plants or whether such a decision is a change within the meaning of the "changes" clause of the contract entitling IPC to equitable adjustment. The Court finds no merit in IPC's contention that neither party intended that IPC assume the risk of a cancellation of the plant. The intent of the parties is to be determined from the face of the contract. *Brawley v. United States,* 6 Otto 168, 173, 96 U.S. 168, 173, 24 L.Ed. 622 (1877). The clear terms of the contract indicate that the risk of cancellation was on IPC. The contract clearly states that TVA does not guarantee to purchase any maximum or minimum amount. The purpose of a minimum/maximum clause is to protect the seller. *Utah Intern, Inc. v. Colorado-Ute Elec. Ass'n, Inc.,* 425 F.Supp. 1093 (D.Colo.1976). Thus, where the contract provides for a minimum purchase, then even if the business closes down pursuant to sound business judgment the buyer must buy the minimum. *Id.* In the absence of a minimum quantity term, the Courts have generally permitted a buyer to decrease orders pursuant to bona fide needs of the business. *Note,* at 1220. Had the seller intended a contrary result he could have protected himself by providing a minimum limitation on quantity. *Id.* In this case, not only did IPC not require a minimum limitation, IPC specifically agreed to no limitation.

 IPC appears to argue that the area designated to be painted imposes a limitation on the quantity of paint that TVA was required to order. The areas designated on the invitation to bid merely provided a standard by which TVA's good-faith requirements could be measured. Had the contract not referred to an objective standard such as requirements or needs of the business but had left the quantity determinable at the personal whim of the contracting officer, the contract would have lacked mutuality. *Note,* at 1215.[2] By specifying an objective standard, TVA did not agree to purchase a specified amount. *See M.W. Kellog Co. v. Standard Steel Fabricating Co.,* 189 F.2d 629 (10th Cir.1951).[3] TVA agreed to pur-

---

**2.** IPC distinguishes between requirements contracts tied to a subjective standard, i.e., such as the "unbridled discretion" of the purchaser, and requirements contracts tied to an objective standard, such as the instant contract. IPC argues that the seminal case *Brawley v. U.S.,* 6 Otto 168, 96 U.S. 168, 24 L.Ed. 622 (1877), involved a subjective standard requirements contract and therefore is inapplicable to the case *sub judice.* In *Brawley,* the contract was for 880 cords of wood, more or less, "as shall be determined to be necessary, by the post commander, for the regular supply, in accordance with army regulations, of the troops and employees of the garrison of said post, for the fiscal year beginning July 1, 1871, and ending June 30, 1872." *Id.,* 96 U.S. at 169. Contrary to IPC's assertion, the contract was tied to an objective standard i.e. the wood needed in the regular supply accord-

ing to army regulations for the troops in the stated time period. *Id.,* 96 U.S. at 173. the post commander determined that only 40 cords of wood were needed. The Supreme Court held that under the terms of the contract the post commander need only purchase the good-faith requirements of the troops. *Id.* The needs of the troops in accordance with army regulations provided the standard by which to measure the post commander's good faith in ordering only 40 cords of wood. *Id.*

**3.** IPC argues that *M.W. Kellogg Co. v. Standard Steel Fabricating Co.,* 189 F.2d 629 (10th Cir. 1951) supports its position that the areas designated in the bid imposed a minimum quantity limitation on TVA. In *M.W. Kellogg,* the company contracted to purchase steel to construct a fluid catalytic cracking unit. The purchase or-

chase only its good-faith requirements. Had TVA not cancelled the plants, TVA would have been obligated to purchase the paint needed for the completed plants. However, nothing in the contract or the law of contracts prevented TVA from making a good faith, bona fide decision to cancel the plants when it determined that the demand for electricity had been overestimated and consequently that the nuclear plants were no longer needed. When TVA cancelled the plants, its requirement for IPC's paint ceased and the risk of a decrease or termination of requirements was on IPC. *See Fort Wayne Corrugated Paper Co., supra; In re Cigar Stores, supra.*[4] IPC might have protected itself against this occurrence by requiring in the contract a termination clause which would have guaranteed it compensation should the project be terminated. *See Note* at 1221.

IPC argues, however, that the "changes" clause protects it against a unilateral decision by TVA to cancel the plants. The Court finds this argument to be without merit. It has been held that a change in the government's needs or requirements is not redressable under a "changes" clause. *Kleen-Rite Corporation,* 81–2 B.C.A. (CCH) ¶ 15,450 (October 24, 1981). Redress under the "changes" clause "is limited to a change in the method of fulfilling the need and/or other facts extraneous to the need." *Id.* (citations omitted). A decision to cancel the nuclear plants is neither a method for fulfilling the need or a factor extraneous to the need. Because the demand for electricity was overestimated, the need for nuclear plants was not as great as anticipated, thus TVA no longer had any need for the plants cancelled or for paint to coat them.

None of the cases cited by IPC supports its position. In *Ted J. Grimsrud,* 1962 B.C.A. (CCH) ¶ 3562 (October 31, 1962), the Board held that the seller's right to recover under a requirements contract for snow removal service after the base closed depended solely on the termination clause. As previously noted, the contract at issue here contains no termination clause. *California Bus Lines,* 76–1 B.C.A. (CCH) ¶ 11,655 (December 9, 1976), held that in a requirements contract for bus service, a route deletion caused by a matter extrane-

---

der contained drawings and specifications which estimated the amount of steel required to complete the unit to be 125 tons, more or less. Actual completion of the unit according to the drawings and specifications required a little more than 52 tons of steel. The question for the court was whether M.W. Kellogg agreed to purchase only the amount required for construction of the unit or the fixed quantity stated in the purchase order. The court held that the contract was a requirement contract which obligated M.W. Kellogg to purchase only the amount of steel used to complete the project as described in the drawings and specifications. Similarly, in this case, had TVA not cancelled the plants, it would have been obligated to follow the specifications in the bid and to purchase the paint needed to coat the plants as specified. By arguing that TVA is now obligated to purchase the amount of paint that would have been required to complete the project, notwithstanding that the project was in good-faith cancelled, IPC essentially takes the position that the contract was a requirement contract for a fixed quantity. This unusual argument ignores the fact that in a requirement contract for construction of a building, the buyer's requirements are determined at the time the project is completed, or in this case terminated. *See M.W. Kellogg,* 189 F.2d at 631–32.

**4.** In *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corporation,* 130 F.2d 471 (3rd Cir.1942), Capstan Glass Co. agreed to buy not less than 90% of its needs of corrugated paper from Fort Wayne for a five year period. Capstan's needs were estimated not to exceed 500 carloads per year. In 1927 a sudden recession of business caused a sharp decrease in demand for glass containers. Anchor Hocking Glass Company purchased the assets of Capstan and operations of the Capstan plant were suspended. The Court held that because of the good faith closing of the plant, Anchor Hocking had no requirements and therefore plaintiff had no cause of action for recovery under the contract. In *In re United Cigar Stores,* 72 F.2d 673 (2d Cir.1934), *cert. den. sub nom.* 293 U.S. 617, 55 S.Ct. 210, 79 L.Ed. 706 (1934), plaintiff's predecessor, Consolidated, contracted to sell to United all the ice cream needed for United's stores for a ten year period. Subsequently the contract was assigned to plaintiff. Thereafter United filed a voluntary petition in bankruptcy. The court held that no breach of the contract had occurred because buyer in good-faith ceased to have requirements when it became bankrupt.

ous to the need for bus service, i.e., lack of motor fuel, is not a risk to be born by the seller because the need for bus service still exists. As stated previously, the decision to cancel the plants was not a decision extraneous to the need for the plants but was a decision made because need had declined. *North Chicago Disposal*, 82–1 B.C.A. (CCH) ¶ 15,488 (December 27, 1981), held that in a contract which guaranteed a fixed monthly fee for collection of garbage and in which the fee was independent of the amount of garbage collected, the government assumed the risk that sufficient garbage would require collection. *North Chicago Disposal* has no relevance to the case at hand. In *Maya Transit Company, A,* 75–2 B.C.A. (CCH) ¶ 11,552 (October 22, 1975), the Board held that in a limited form requirements contract where the government agreed to buy all its needs which it could not supply itself with existing capabilities, the government's decision to cancel, due to budget limitations, one route and to supply that route itself amounted to the development of additional capabilities by the government and thus came under the "changes" clause. In the case *sub judice*, as previously noted, the need for nuclear plants decreased, thus necessitating the decision to cancel the plants. In *Maya Transit Company* the need still existed. *Old Atlantic Services, Inc.,* 74–1 B.C.A. (CCH) ¶ 10,494 (February 21, 1974), held that a change in the contract performance schedule which caused an increase in the cost of performance was a change compensable under the "changes" clause. Again, *Old Atlantic Services* did not involve a decrease in need as does the case *sub judice*. In *Desco Services Contractors,* 77–2 B.C.A. (CCH) ¶ 12,752 (September 2, 1977), the Board held that the changes clause was applicable when the government changed scheduled service on cars under a requirements contract to provide vehicle maintenance from 4-month to 6-month intervals. The Board specifically stated that the claim was not based on actual requirements turning out to be less than the estimate, which was a risk born by the seller.

IPC's argument that an equitable adjustment is proper by virtue of Section 2–306 of the Uniform Commercial Code is also without merit. Section 2–306(1) does not preclude good faith reductions that are highly disproportionate to normal prior requirements or stated estimates. *R.A. Weaver & Assoc., Inc. v. Asphalt Constr. Inc.,* 587 F.2d 1315, 1322 (D.C.Cir.1978); *see also Note* at 1220.

In summary, the Court holds that a good-faith decision to cancel the nuclear plants for which paint was contracted is a risk assumed by the seller, IPC, and is not a change compensable under the "changes" clause. If IPC did not intend to assume the risk of cancellation, it could have protected itself by requiring in the contract a minimum clause or a termination clause. "If the contract did not express the true agreement, it was [IPC's] folly to have signed it." *Brawley v. United States,* 6 Otto 168, 173, 96 U.S. 168, 173, 24 L.Ed. 622 (1877).

For the foregoing reasons, defendant's motion for summary judgment is denied and plaintiff's motion for summary judgment is granted, and this case is dismissed.

Order Accordingly.