[No. 2740.]

# THE MONTROZONA GOLD MINING COMPANY ET AL. V. THATCHER.

1. **Mines and Mining—Contracts—Lease—Sinking Shaft—Time —Forfeiture.**

A mining lease for two years from January 1, 1900, required the lessee to sink a shaft 200 feet during the term of the lease—100 feet to be completed on or before January 1, 1901; and provided that a failure to keep any or all agreements, express or implied, in the lease, should work a forfeiture thereof. Held, that the agreement to complete 100 feet of the shaft on or before January 1, 1901, was of the essence of the contract, and a failure to complete said 100 feet on said day worked a forfeiture of the lease.

2. **Same.**

Where a mining lease obligated the lessee to sink a shaft 100 feet on or before a certain day named, one year from beginning of the lease, upon penalty of forfeiture of the lease, and the work of sinking the shaft was not commenced for nearly nine months and was completed nine days after the expiration of the time, the fact that the lessee in sinking the shaft encountered running ground which he had not anticipated, but for which running ground he would have completed the work on time, would not relieve him from the forfeiture.

3. **Same.**

Where a mining lease obligates the lessee to sink a shaft a certain depth on or before a certain day, upon penalty of forfeiture of the lease, a substantial compliance with the agreement, or a compliance after the expiration of the time limit, will not relieve the lessee from the penalty of forfeiture of the lease.

4. **Same.**

Where the lessee of a mine obligated himself to sink a shaft a certain depth on or before a certain date, upon penalty of forfeiture of the lease, and by reason of his failure to complete the shaft within the time, the lease was forfeited, but the lessee continued to mine the property claiming that, having substantially complied with the contract by completing the shaft a few days after the expiration of the time, the lease was not forfeited, the lessee after such forfeiture was not a willful trespasser, and upon an accounting between him and the lessor for ore taken out after the forfeiture, the lessee should be allowed the cost of mining the ore.

*Appeal from the District Court of Pitkin County.*

Mr. W. D. REED and Mr. J. G. McMURRY, for appellants.

Mr. H. W. CLARK and Mr. E. E. EDMONDS, for appellee.

MAXWELL, J.

Appellee, owner of an undivided 1-16th of the Midnight lode mining claim, Highland mining district, Pitkin county, joined with the owners of the undivided 31-32nds interest in the property, in granting a mining lease to McGregor and Shields, dated —— November, 1899, for a term of two years from January 1, 1900, upon the following covenants, *inter alia:*

"To sink the shaft upon said premises, known as the Midnight shaft, from its present depth (now 425 feet), at least two hundred (200) feet, during the term of this lease. The first one hundred (100) feet of said sinking to be completed on or before the 1st day of January, 1901. Said lessees furthermore agree that in case they fail to commence work on said premises as aforesaid  *  *  *  or to sink said shaft as above required, or in any respect keep and fulfill any or all agreements herein expressed or implied, then and in that case it shall be lawful for the parties of the first part  *  *  *  to declare this lease void and of no effect, and thereafter, and without process of law, to enter upon and take possession of said premises."

By assignment October 4, 1900, the lease was transferred to appellants, who entered into possession of the property and prosecuted work under the lease.

January 4, 1901, appellee caused to be served upon appellant a written notice of forfeiture, for the

alleged failure upon the part of the original lessees and appellants to sink the shaft 100 feet by January 1, 1901, to properly timber the shaft, and to pay royalty as required by the terms of the lease. Coupled with the notice of forfeiture was a demand for possession. This written notice of forfeiture and demand for possession purported to be signed by the owners of 7-16ths of the property, including appellee.

July 1, 1901, appellee commenced this action in the court below, to recover possession of her undivided 1-16th interest in the property, for an injunction to restrain further working of the property by appellants, for $5,000 damages for its detention, and for an accounting of the proceeds of the ore mined, shipped and sold from the property by appellants. The other owners who signed the notice of forfeiture were not parties to this suit.

The complaint alleged the making of the lease, set forth its covenants, the breaches thereof by appellants, service of notice of forfeiture, and other matters immaterial to a determination of this case.

The answer denied the breaches alleged, except the failure to sink the shaft 100 feet by January 1, 1901, which breach was confessed, alleged a substantial compliance with this covenant, and averred matters in avoidance. A jury trial resulted in a verdict in favor of appellee, that she was the owner in fee of 1-16th of the property and entitled to the occupation and possession thereof.

December 14, 1901, judgment was entered on the verdict in favor of appellee, and an order was made for an accounting before the court, which accounting resulted in a judgment in favor of appellee for $1,146.02.

It will be unnecessary to discuss in detail the seventy-one errors assigned by appellants, as most

of them have been abandoned, and this opinion will be confined to a presentation and decision of such matters only as appear to be decisive of this appeal.

Appellants contend, that time was not of the essence of the covenant to sink the shaft 100 feet by January 1, 1901; and even if it was, that there was a substantial compliance with this covenant upon their part, and that appellee waived a strict performance of this covenant.

The jury, upon conflicting testimony, in answer to an interrogatory submitted, found that there had been no waiver; and as there was no error in the instructions upon this point, the finding of the jury precludes investigation of this question.

The testimony shows, that appellants' assignors commenced to sink the shaft the latter part of September, 1900; that sinking the shaft was diligently prosecuted until January 10, 1901, when the 100 feet was completed; that running ground was encountered which necessitated a drift around the shaft to catch up and hold this running ground; that on account of this bad and running ground, the bottom of the shaft was lost two or three times; that every possible effort was made by appellant to complete the shaft within the time required by the lease, without avail; and it is conceded that January 1, 1901, the shaft had not been sunk 100 feet, as required by the lease, although it appears from the testimony that the 100 feet was completed on January 10, 1901.

The language of the lease does not, in express terms, make time of the essence of the contract; but it would be difficult to conceive of language which would more clearly imply that such was the intention of the parties, in the contract under consideration. To hold otherwise would be to make a contract for the parties, which they have not made for themselves, which the courts will never do. The lease

provides, that in case lessees fail to sink the shaft in the time required, or fail in any respect to keep and fulfill any or all agreements therein expressed or *implied,* it shall be lawful for the lessor to declare the lease void and of no effect.

It would seem that the parties to this lease could not have used language more pertinent than the above, to express their intention to make time of the essence of the contract.

"It is now thoroughly established that the intention of the parties must govern; and if the intention clearly and unequivocally appears, from the contract, by means of some express stipulation, that time shall be essential, the time of completion or of performance or of complying with the terms will be regarded as essential in equity as much as at law. No particular form of stipulation is necessary, but any clause will have the effect which clearly and absolutely provides that the contract is to be void if the fulfillment is not within the prescribed time."—Pomeroy on Specific Performance, 462.

The authorities cited by appellants, in support of the contention that neither time nor the manner of performance of covenants is construed as the essence of a contract, unless made so by the terms of the instrument or clearly implied, upon examination, are found to be cases in which specific performance of contracts for the conveyance of land, was sought to be enforced, or cases involving oil leases, the facts of which cases make them clearly and easily distinguishable from the case under consideration.

Appellants do not contend that they could purposely or negligently fail to comply with the terms of the lease, but assert that the equitable principle is well established, that when there is an excusable failure to perform, and when the status of the parties is not changed by such failure, then a court of equity

will relieve the party in default from a forfeiture, and appellants insist that the facts in this case bring them within this equitable principle.

The undisputed facts are, that sinking the shaft was not commenced until the latter part of September, 1900; that under ordinary circumstances and conditions ninety days would afford ample time to complete the 100 feet, and that running ground prevented the completion of the 100 feet within the time limited by the lease.

While it is true that appellants did not acquire the lease by assignment, until after October 1, 1900, they must be held to have taken it with full knowledge of all its covenants and the duties thereby imposed.

It cannot seriously be contended that one who stands idly by during three-fourths of the time within which he has contracted, under penalty of forfeiture, to complete his work, is excusable for failure to perform his contract within the time limit, by reason of the fact that conditions were encountered which he did not anticipate. Having speculated with chance, he must suffer the consequences.

If parties will make contracts involving forfeitures, they must comply strictly with the terms of such contracts, or show good and sufficient reasons for noncompliance, which do not appear in this case, and they must not expect to get relief by interposition upon the part of the courts.

We have been cited to no authority, and we know of none, which holds that a *substantial* compliance with a covenant, such as the one herein involved, or a compliance after the expiration of the time limit, in face of the clear and concise expression of the agreement of the parties, as written, will relieve from the penalty of forfeiture imposed, by equally clear and concise language.

The jury having found under proper instruc-
tions against appellant upon the question of waiver,
it was the province of the court to declare the mean-
ing of the agreement, which it did in accordance with
the views herein expressed. The verdict of the jury
and the judgment of the court upon this branch of
the case were right.

As hereinbefore stated, an accounting was had
before the court, which resulted in a judgment
against appellants for $1,142.06.

The accounting was for the purpose of deter-
mining the amount of ore mined, shipped and sold
from the property by appellants, and presumably
the expenses incident thereto.

The book-keeper for appellants testified that, all
the ore mined, shipped and sold from the property
by appellants was shipped to The Taylor & Brunton
Smelting Works Company, Aspen, and not elsewhere;
that 994,610 pounds of ore and 557,550 pounds of
concentrates were shipped, giving the date, number
of pounds and returns of each shipment; that the
total receipts of appellants from such shipments
were $12,512.97, which amount was exclusive of
treatment charges, sampling, hauling and railroad
transportation; that the concentration was about four
tons to one ton. This witness produced and identified
vouchers, pay rolls and checks which were intro-
duced in evidence, and were said to represent the dis-
bursements by appellants in the prosecution of the
work under the lease from January 6 to December
31, 1901, the period covered by the accounting, which
disbursements total $21,320.37, as stated by counsel
for appellants in their brief, and not disputed by
counsel for appellee, although appellee filed excep-
tions to a large number of the items represented by
the vouchers, etc., and contested the same, upon the

ground that they did not represent expenses incurred in operating the lease.

Two witnesses for appellee testified that, accompanied by the superintendent of appellants, the afternoon of the day before they testified, they had made certain measurements· and estimates of the amount of ore which had been extracted by appellants, from which measurements and estimates they *estimated* that 1,580 tons of ore had been so extracted.

. One of the witnesses, the husband and agent of appellee, testified that the value of this ore was $33,305.00, which value was based upon some six or eight assays of ore which he had taken at various times preceding the day on which the examination of the property was made, and upon his general knowledge of the ore.

These two witnesses of appellee also testified, that the cost of mining and hoisting the ore to the surface was $2.50 per ton. It appears from some sixteen settlement sheets found in the transcript of record, that the average cost for treatment, sampling, hauling and railroad freight, of the ore shipped and sold by appellants, was approximately $17.50 per ton.

If we accept the testimony of the book-keeper as to the receipts of appellants ($12,512.97), deduct therefrom $2.50 per ton—the cost of mining, tramming and hoisting to the surface 994,610 pounds, or 497 tons of crude ore, and 1,115 tons of ore concentrated to 557,550 pounds of concentrates at four to one, a total of 1,612 tons—we have remaining $8,482.97, 1-16th of which is $530.18. In other words, deduct from $12,512.97—the total receipts—$4,030, the cost of mining, etc., 1,612 tons at $2.50 per ton, and we have $8,482.97, 1-16th of which is $530.18.

If, on the other hand, we accept the testimony of appellee's witnesses, that 1,580 tons of ore were extracted and sold by appellants of the value of

$33,305.00, and deduct therefrom the cost of treatment, sampling, hauling and railroad freight—$17.50 per ton—and mining, tramming and hoisting to the surface—$2.50 per ton—we have $705.00, 1-16th of which is $44.06.

Again, if appellants be regarded as willful trespassers (after the service of notice of forfeiture and demand for possession and refusal to surrender), and all expenses of mining and hoisting the ore be disallowed, the results are, accepting appellants' testimony as to the receipts, $12,512.97, 1-16th thereof would be $782.06; or accepting appellee's testimony, that the value of the ore extracted was $33,305.00, and deducting therefrom the cost of treatment, etc.—$17.50 per ton—1-16th of the value of the ore is $353.43.

In all of the foregoing computations no allowance has been made for cost of concentration of the ore.

The learned judge before whom the accounting was had does not disclose the method of computation adopted in arriving at the judgment rendered upon the accounting. In any view taken, the judgment rendered upon the accounting is erroneous and must be reversed.

For the guidance of the court and counsel in the event of further proceedings in court below, an expression of the views of this court is deemed proper.

Under the facts as disclosed by this record, appellants cannot be considered willful trespassers within the ordinary legal acceptation of that term, and, therefore, should be allowed, upon an accounting, the cost of mining, tramming and hoisting the ore to the surface. The value of the ore is the amount received from the smelter or ore buyer, after deduction has been made for the cost of treatment, samp-

ling, hauling and railroad freight.  If any portion of the ore has been concentrated, the cost of concentration is a legitimate item of expense for which credit should be allowed appellants.

The judgment rendered upon the verdict will be affirmed, the judgment rendered upon the accounting will be reversed, the parties to pay their own costs, and the cause will be remanded for further proceedings in accordance with the views herein expressed.

*Reversed.*