**MaceRICH REAL ESTATE COMPANY VI, a California general partnership, Plaintiff,**

**v.**

**HOLLAND PROPERTIES CO. et al., Defendants.**

Civ. A. No. 78–C–600.

United States District Court, D. Colorado.

Aug. 4, 1978.

Patrick M. Westfeldt, Jack L. Smith, and C. Jean Steward of Holland & Hart, Denver, Colo., for plaintiff.

Patrick F. Kenney of Fairfield & Woods, Denver, Colo., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

CHILSON, District Judge.

This is an action for specific performance and for breach of two contracts, one between plaintiff, MaceRich Real Estate Company VI, and two Colorado partnerships, Holland Properties Co. and A & A Properties, Ltd., and the second between plaintiff and Industrial Western, Inc., a Utah corporation, and its shareholders. A temporary restraining order having been entered on June 16, 1978, the case is now before the Court on plaintiff's motion for a preliminary injunction to restrain the shareholders of Industrial Western from alienating their shares of stock in the corporation. Jurisdiction is founded upon diversity of citizenship and is not contested.

From the evidence presented at the June 16, 1978, hearing on plaintiff's motion for a temporary restraining order and the hearing of June 23 and July 10–12 on the plaintiff's motion for a preliminary injunction, the Court finds as follows.

## FINDINGS OF FACT

Industrial Western owns a 73% undivided interest in property commonly known as the Crossroads Shopping Center in Boulder, Colorado. Holland Properties owns a further 20% interest and A & A Properties owns a 5% interest in the same property. MaceRich, a California partnership, is in the business of acquiring and managing shopping centers throughout the United States.

In the acquisition process, MaceRich acts in the nature of a broker, locating and evaluating properties, conducting the negotiations for sale, and executing the sale agreement. The actual financing for the venture comes from institutional lenders, usually insurance companies, which have agreed to act as MaceRich's financial partner. (Tr. 6/23/78, at 73.)

In late 1977, MaceRich instituted negotiations with representatives of Industrial Western, Holland, and A & A Properties for the purchase of their interests in Crossroads. These negotiations resulted on April 28, 1978, in the execution of a contract between plaintiff and Holland and A & A Properties, (the Holland Agreement, Ex. A). Negotiations on behalf of Industrial Western were conducted by Wilford Burton as president, shareholder, and as holder of a power of attorney executed by shareholders owning over 90% of the stock of the corporation. Instead of a straight sale of the property, Burton and MaceRich agreed to a buyout of 90–100% of the corporate stock. An agreement to this effect was executed by MaceRich and Burton on May 8, 1978 (the Burton Agreement, Exhibit 1).

Certain terms of the Burton Agreement are germane to the instant litigation. Closing under the agreement was to occur "on or before May 31, 1978." (Burton Agreement, para. 11) Since at the date the contract was executed MaceRich had not yet obtained a financial partner for the venture, the contract required as a "condition precedent" that MaceRich obtain and provide to the seller the written financial commitment of an institutional lender by May 15, 1978. (Burton Agreement, para. 9.1(c); 10.1(c)). The contract further provided:

"In the event of the failure of Purchaser to obtain the commitment from Institutional Lender as provided in Paragraph 9.1(c) . . . Seller may, at its option, terminate this Agreement. Upon termination hereunder . . . neither party hereto shall have any further rights, obligations or claims for damages relating to the failure to consummate this Agreement." (Para. 10.2)

The purchase price was set at $8,290,-000.00 (to be prorated downward if less than 100% of the shares were acquired) payable in part in cash and in part by promissory notes. (Burton Agreement, para. 2.1). The promissory notes could vary at the option of the seller from one to ten years in duration and were to be guaranteed by a national bank with designated minimum assets and net worth. (*Id.*) To allow an informed choice by an individual shareholder as to the percentage of the purchase price he desired in cash and as to the duration of the promissory notes, (see Tr., 7/10–11/78, Vol. II, at 35, 36, 74), the contract required MaceRich to designate the name of the guarantor bank in writing by May 15 for the approval of Wilford Burton. (Burton Agreement, para. 2.1)

In paragraphs 10.1(6) and 10.2 of the Burton Agreement, the failure of the purchaser to "perform and comply with all agreements, covenants and conditions required to be performed and complied with prior to or at the closing" was prescribed as grounds for terminating the agreement at the option of the seller.

Finally, the contract provided that "[t]his Agreement constitutes the entire agreement between the parties hereto . . . and supersedes all prior agreements . . . and all understandings, negotiations or discussions of the parties . . . ." (Burton Agreement, para. 19)

The Holland agreement contained a termination clause similar to that contained in the Burton contract and was scheduled to close on the same day. (See Holland Agreement, para. 8.1(c), 9.1(b), 9.2, 10.2) Each contract provided that should one contract fail to close concurrently with the other, the second contract would terminate automatically. (Holland Agreement, para. 10.5; Burton Agreement, para. 11.9).

Virtually the only dispute between the parties as to the facts of this case relates to the occurrences of May 8. At that time, MaceRich had been courting Provident Life & Accident Insurance Company to act as MaceRich's financial partner. A meeting for final approval of the proposal by Provident's finance committee had been requested for May 10, then postponed until May 17. (Tr., 6/23/78, at 78) Arthur Coppola, a general partner of MaceRich who was present at the signing of the contract on May 8, testified that he informed Burton of this delay (and of MaceRich's consequent inability to obtain the commitment of its financial partner by May 15) at the signing. According to Mr. Coppola, Burton replied: "Art, you do the best you can." (Tr., 6/23/78, at 18) Mr. Burton, on the other hand, testified that he had been informed only of the May 10 date and was not advised of any delay. (Tr., 7/10–11/78, Vol. II, at 57, 69) Resolution of this dispute is unnecessary in light of the Court's findings of law discussed below.

It does appear, however, that MaceRich's meeting with Provident took place on May 17–19, 1978. Burton had attempted to contact MaceRich on May 17 to discover the identity of the guarantor bank. (Tr., 7/10–11/78, Vol. II, at 70). Ed Coppola, an employee of MaceRich, returned Burton's call while en route to the Provident meeting. Ed Coppola assured Burton that the requested information would be forthcoming at the close of the meeting. According to Ed Coppola's testimony, Burton replied: "Okay, Ed, when you find out, please tell me." (Tr., 6/23/78, at 100)

On May 19, MaceRich learned that Provident was unwilling to join in the Crossroads purchase. (Tr., 6/23/78, at 33) Also during this period MaceRich came to believe that national banks were prohibited from issuing the form of guarantee specified in the contract. Nonetheless, Ed Coppola continued MaceRich's efforts to line up a financial partner by meeting with Aetna and Con-

necticut Mutual Insurance Companies on May 22 and 23. Both companies indicated their interest in the venture.

On May 23, Arthur Coppola called Burton to advise him of MaceRich's difficulties and hopes and to inform Burton that a 30-day delay would be necessary in order to close. (Tr., 6/23/78, at 34–35) Coppola also suggested that a guarantee from MaceRich's financial partner be substituted for the national bank guarantee. (*Id.*) Burton made no reply other than to ask that Coppola send a letter containing the information relayed during the phone conversation. (Tr., 6/23/78, at 36; Tr. 7/10–11/78, Vol. II at 72) Arthur Coppola responded to this request in a letter of May 24 (Ex. 2) stating in pertinent part as follows:

"As of this date, we have not finalized our agreement with an Institutional Lender . . . In light of this we feel it would be appropriate to modify the contract to provide for a closing date of June 30, 1978 . . .

"As I have discussed with you by telephone, we have recently discovered that a national bank cannot under regulatory laws provide you with the guarantee outlined in Exhibit F of the contract. We would therefore propose that we provide you with a guarantee directly from our Institutional Partner in lieu of the national bank guarantee."

Also on May 24, MaceRich representatives met with Connecticut General Insurance Company to discuss the Crossroads property. (Tr., 6/23/78, at 38)

Burton discussed Arthur Coppola's letter of May 24 with George Bishop, a substantial stockholder and vice-president of Industrial Western. (Tr., 7/10–11/78, Vol. II, at 75–76) The two decided to terminate the agreement. On May 26, 1978, Burton sent notice of the termination to MaceRich (Ex. 3), stating in pertinent part:

"In reply to your letter of May 24, 1978, it appearing that you have failed to meet the terms of the Agreement in providing us the name of the institutional lender/partner by May 15, 1978, and your advice that as of May 24, 1978, you had not been able to secure an institutional lender/partner, and further that you would not be able to comply with furnishing a bank as a guarantor as provided by the Agreement and particularly Exhibit "F", and requesting an extension of time with suggested negotiations for arriving at an adjustment in the consideration, the undersigned, as President of Industrial Western, and as Power of Attorney for the shareholders of Industrial Western, has determined and declares herewith the Agreement as terminated."

This letter was received by MaceRich on May 30. (Tr., 6/23/78, at 40)

Arthur and Ed Coppola learned of the termination while attending meetings with Connecticut Mutual, Connecticut General, and Aetna Insurance Companies on May 30–31. On May 31, Aetna gave a verbal commitment to act as MaceRich's financial partner. News of this development was left with Mr. Burton's secretary by Ed Coppola. (Tr., 6/23/78, at 101) On June 1, Ed Coppola met with Burton to inform him of Aetna's commitment and to announce a revised closing date of June 15, 1978. (*Id.*, at 101–02) Burton unequivocally replied that the May 8 contract was "dead" and that any further negotiations would have to be at a "new price." (*Id.*, at 103–04) In a letter of June 1, Burton informed the other Industrial Western stockholders of the termination of the contract. (Ex. G)

Subsequent contacts between the two parties followed a pattern similar to that of the June 1 meeting. On June 2, MaceRich representatives phoned Burton to reiterate the information conveyed by Ed Coppola the day before. Burton replied that he could not make a response but on Monday (June 5) "I will let you know what we're going to do." (Tr., 6/23/78, at 69) In a letter dated June 2, Richard Collins, attorney for MaceRich, again notified Burton of the June 15 closing date. (Exhibit 9) Burton replied on June 5 that the contract had been terminated by the letter of May 26. (Ex. 8) Two letters from Collins on July 9 (Ex. 10, 11) also referred to the June 15 closing date and received substantially the

same response from Burton. (Ex. 12) A final letter from Collins' office dated June 13, 1978, (Ex. 13) went unanswered.

In the meantime, MaceRich continued its attempts to obtain the written financial commitment and guarantee required by the contract. On or before June 2, Citibank, N.A. had verbally agreed to issue a form of guarantee of the promissory notes. (Tr., 7/10–11/78, Vol. I, at 68) The identity of the guarantor bank was never conveyed to Burton prior to the institution of this suit, although Collins' letter of June 9 (Ex. 10) stated that MaceRich "has obtained" the guaranty of a national bank "as provided in the Agreement." This claim was shown at trial to be erroneous, for it was not until June 15, 1978, that a written commitment to issue a guarantee was obtained from Citibank. (Ex. 6) The precise form of the guarantee letter was not approved by Citibank until at least June 19 (see Ex. Y) and was not returned to MaceRich, together with Citibank's written approval, until June 23, 1978. (Ex. 7; Tr., 6/23/78, at 66.) Comparison of the form of guarantee specified in Exhibit F to the Burton Agreement and the form of "irrevocable letter of credit" approved by Citibank (Ex. 7) readily reveals that the two are not similar in form.

Collins' letters of June 2 and 9 (Ex. 9, 10) also state that MaceRich "has obtained" a financing commitment from an institutional lender "as provided in the Agreement." This claim, too, was shown to be erroneous. The verbal commitment from Aetna on May 31, 1978, was rejected by the Real Estate Investment Department Committee at Aetna on June 9. (Tr., 7/10–11/78, Vol. IV, at 49–50) The committee reversed its decision on June 12 (*Id.,* at 57) and it was not until June 14 that a written commitment was executed. (Ex. 5) Burton was sent a copy of this document executed by Aetna. (Tr., 6/23/78, at 51–52) To date, no written partnership agreement between Aetna and MaceRich has been executed. (Tr., 6/23/78, at 66)

On June 15, 1978, representatives of MaceRich conducted a "closing" of the Burton and Holland agreements in Boulder, Colorado. None of the defendants nor any representative of them attended. At 3:44 P.M. that same day, the complaint in this action was filed with the Clerk of the Court. At a hearing the following afternoon, the Court, after hearing the testimony of Arthur Coppola and the arguments of plaintiff's counsel, issued a temporary restraining order to prohibit the stockholder defendants from transferring their stock in Industrial Western to any party other than the plaintiff. Defendants, although notified of the hearing, failed to attend personally or by counsel.

In support of its claim that the plaintiff will suffer irreparable damage if the preliminary injunction is not granted, the plaintiff called Arthur Coppola who testified that if the defendant shareholders or the defendant Burton sell the shares of stock that are subject to the Burton agreement, the plaintiff would suffer damages consisting of the following:

A substantial investment to date for legal fees, services, travel, and other expenses in closing the transaction, and future management, development and acquisition fees in excess of $1,000,000.00.

## CONCLUSIONS OF LAW

■ The prerequisites to granting a preliminary injunction are discussed in *Crowther v. Seaborg,* 415 F.2d 437, 439 (10th Cir. 1969):

> "In hearings upon motions for temporary or preliminary relief, the burden is upon the one requesting such relief to make a prima facie case showing a reasonable probability that he will ultimately be entitled to the relief sought. The applicant has the additional burden of showing a right to the specific injunctive relief sought because of irreparable injury that will result if the injunction is not granted. There must exist a probable right and a probable danger."

(footnotes omitted)

Proof supporting the claims of irreparable injury and probability of success must be clear and unequivocal. *Penn v. San Juan*

*Hospital, Inc.,* 528 F.2d 1181, 1185 (10th Cir. 1975). Judged by this rigorous standard the evidence currently before the Court fails to satisfy the plaintiff's burden.

## I.

## PROBABILITY OF SUCCESS

Plaintiff's claim of "probability of success" rests upon three contentions: first, that time was not of the essence of the Burton Agreement; second, that even if time was essential timely performance was waived by the defendant Burton; and third, that the plaintiff was able to close within a reasonable period of time. Only the first two contentions need to be discussed.

Where time is of the essence of a contract,

"it means that the provision for the contract which fixes the time of performance is to be regarded as a vital term of the contract, the breach of which may operate, at the election of the party not in default, as a discharge of the contract. Performance at or within the time specified is essential before the right to require counter performance." *Hopkins v. Underwood,* 126 Colo. 224, 228–29, 247 P.2d 1000, 1002 (1952).

As stated in *Dunton v. Stemme,* 117 Colo. 327, 331–32, 187 P.2d 593, 596 (1947) "time of the essence" means

"that time is such a material matter as to require exact compliance with the terms of the contract in this respect before there is any right to require a counter-performance."

■ No particular formula is required to make time "of the essence" of a contract. *State Fair Exposition v. Lippert Bros.,* 243 F.2d 290, 292 (10th Cir. 1957); *Gold Mines v. Gold, Silver & Tungsten,* 104 Colo. 478, 500, 93 P.2d 973 (1939). Time will be considered "of the essence" where the contract expressly so provides, where definite terms of the contract show that the parties regarded the time of performance to be of vital importance, or where the nature of the property or the exigencies of the transac-

tion make timely performance essential. *King v. Stevenson,* 445 F.2d 565, 569 (7th Cir. 1971); *Gold Mines v. Gold, Silver & Tungsten,* 104 Colo. 478, 500, 93 P.2d 973 (1939); *White v. Greenamyre,* 77 Colo. 33, 35, 234 P. 164 (1925); Restatement of Contracts § 276(a) (1932). Where the subject matter of the contract fluctuates in value, for example, "time is of the essence though not expressed in the contract." *Mercury Gas & Oil Corp. v. Rincon Oil & Gas Corp.,* 79 N.M. 537, 445 P.2d 958 (1968). In the absence of express language, however, Colorado courts are reluctant to imply terms which would terminate the contract. *Utah International, Inc. v. Colorado-Ute Electric Ass'n, Inc.,* 425 F.Supp. 1093 (D.Colo.1976).

■ The Burton Agreement provides that should the purchaser fail to procure a financial commitment or notify the seller of the identity of the guarantor bank by May 15, the seller, at its option, could terminate the contract. The legal effect of this language under the rules discussed above is illustrated by the opinion in *Montrozona Gold Mining Co. v. Thatcher,* 19 Colo.App. 371, 75 P. 595 (1904). In that case a mining lease provided that if the lessee should fail to deepen the mine shaft by 100 feet by January 1, 1901, "it shall be lawful for the [lessor] . . . to declare this lease void and of no effect . . ." 19 Colo.App. at 372, 75 P. at 595. The shaft reached the 100 foot mark on January 10, 1901, but notice of forfeiture had already been delivered by the lessor. The lessor then filed suit for possession of the property. In answer to the lessee's claim that the January 1 deadline was not of the essence the court, referring to the language of the lease quoted above, stated:

"The language of the lease does not, in express terms, make time of the essence of the contract, but it would be difficult to conceive of language which would more clearly imply that such was the intention of the parties, in the contract under consideration." 19 Colo.App. at 374, 75 P. at 596.

A second analogous case, *Kays v. Brack,* 350 F.Supp. 1243 (D.Idaho 1972) involved

the sale of corporate stock. A provision in the sale contract made the purchaser's obligations contingent upon the purchaser's ability to secure financing within ten days of the execution of the contract. The clause also provided that should the buyer be unable to obtain financing within that period, either party could elect to terminate the contract. The Court refers to no express "time is of the essence" provision in the contract. Closing was set for October 16, 1971; on October 14, the buyer requested an extension of time to obtain financing; on October 17, the seller served notice of termination; on October 28 or 29, the buyer received a firm loan commitment. The court enforced the termination clause and denied the buyer's claim for damages for breach of contract.

In light of the cases cited above, the Court concludes that, as the proof now stands, the plaintiff has not clearly and unequivocally shown that the May 15 deadline was not of the essence of the Burton Agreement. The contract expressly authorized termination if the purchaser failed to obtain a financial partner and a guarantor bank by May 15. It is undisputed that MaceRich failed to fulfill these obligations by May 15. In the absence of waiver this failure would make the plaintiff's success on the merits of the case unlikely.

The Court also concludes that the plaintiff has failed to demonstrate that the May 31 closing date was not of the essence. First, the agreement requires that closing take place "on or before" May 31. The legal meaning of this language is that the closing must occur "at any time prior to *but not later than*" May 31. *Grizzly Bar, Inc. v. Hartman,* 169 Colo. 178, 185, 454 P.2d 788 (1969) (emphasis supplied). This clear indication that time was essential is reinforced by the nature of the transaction involved. Expert witnesses of both the plaintiff and defendant testified that shopping center properties can fluctuate significantly in value in a period of a few months. (Tr., 7/11/78, Vol. III, at 31–32, 49–50; Tr., 7/12/78, Vol. V, at 19). Although there was conflicting testimony about the fluctuation in value of the Crossroads property

between December 1977 and May 1978, there was considerable testimony that the imminent introduction of a new Target store in the Crossroads' trade area could significantly reduce the property's value. (Tr., 7/11/78, Vol. III, at 34–35; Tr., 7/12/78, Vol. V, at 15–16). Both parties are experienced in the field of shopping center management and were aware of the often dramatic fluctuations in value undergone by such properties. The selection of a specific date on or before which closing is to occur consequently shows an intent to make the date an essential term of the contract. There is no contention that plaintiff could have closed the sale on May 31.

■ Time being of the essence of the contract, it is next necessary to determine whether there was a waiver. Plaintiff finds a waiver, first, in Burton's alleged comment on May 8 telling Art Coppola to "do the best you can;" second, in Burton's comment of May 17 asking Ed Coppola to inform him of the results of the meeting with Provident; third, in Burton's conduct during the month of May; and, fourth, in the alleged failure of Burton to give timely notice of the termination. Plaintiff does not contend, nor can it, that there was a mutually agreed upon extension of the time for performance. Modification of a contract requires mutual consent and cannot be accomplished by unilateral fiat. *Atchison v. City of Englewood,* Colo., 568 P.2d 13, 19 (1977). It is undisputed that the June 30 and June 15 closing dates were set by MaceRich without consulting with the defendants and without their consent.

■ The plaintiff's reliance upon the alleged remarks of Mr. Burton is misplaced. A waiver can only be found from clear unequivocal conduct or statements betraying an intent to relinquish known rights. *Hunter Milling Co. v. Koch,* 82 F.2d 735, 736 (10th Cir. 1936); 92 C.J.S. Waiver (1955). The statements attributed to Mr. Burton are far from unequivocal. Burton's statement on May 8 could easily be interpreted as friendly advice to fulfill the contract as written rather than as an assurance that

noncompliance would be free of unpleasant consequences. It strains credulity to believe that the signatory of a contract would expect, or receive, a waiver of a vital term in the contract executed just moments before. Even if regarded as a waiver the comment, at most, extended the time for performance until May 17, the date of the meeting with Provident. This is demonstrated by an exchange during the cross examination of Arthur Coppola:

"Q. And you knew at the time you signed the contract that you had one week [to obtain a financial commitment]?

"A. *I knew that I had nine days between May 8 and May 17.*" (Tr., 6/23/78, at 80) (emphasis supplied)

The plaintiff cannot now assert as an unqualified waiver what at the time it regarded as a two day extension.

Burton's remark of May 17, far from being a waiver, was a demand for compliance with the contract. Burton initiated the contact with MaceRich in order to request the identity of the guarantor bank. He was informed that MaceRich would not only comply but was actually in the process of complying with the contract. Burton gave no encouragement to MaceRich but merely forbore from exercising his right to terminate the contract. A slight delay in termination to allow MaceRich to complete an on-going effort to perform does not waive forever the right to terminate the contract.

Burton's actions during the month of May in no way prejudiced his position. This would be a different case if, after the breach of the contract, Burton had allowed MaceRich to perform and had then attempted to terminate. See *State Fair Exposition v. Lippert Bros., Inc.,* 243 F.2d 290 (10th Cir. 1957); *Houy v. Davis Oil Co.,* 175 Colo. 180, 486 P.2d 18 (1971). It would be a different case if Burton had continued negotiations with MaceRich after the May 15 date expired. However, neither before nor after May 15 did Burton take any action inconsistent with the preservation of his right to terminate the contract. Plaintiff has failed to sustain its burden to establish Burton's conduct as an implied waiver.

Finally, notice of the termination of the contract was not unduly delayed. It is pertinent to note that the contract made no requirement for notice should a party exercise a right to terminate. As noted earlier, the decision to terminate was made in a timely manner. Burton learned of MaceRich's inability to perform on May 23. Plaintiff concedes that Burton's request for a letter confirming the information delivered orally on May 23 was reasonable in light of the fact that Burton acted on behalf of multiple parties with whom he needed to confer. (Plaintiff's Brief of 7/21/78 at 27). The termination of the contract on May 26 occurred promptly after receipt of this letter. The mail service is a reasonable method of delivering notice to the plaintiff. MaceRich has not pointed to any material prejudice resulting from the use of the mails.

In sum, by failing to demonstrate that time was not of the essence of the agreements and by failing to establish a waiver the plaintiff has not shown a probability of success on the merits of the case.

## II.

### IRREPARABLE DAMAGE

The evidence before the Court does not disclose that under the partnership agreement to be executed with Aetna, MaceRich would have any ownership interest in the stock of Industrial Western or the Crossroads property.

The only damages found in the evidence are entirely compensable by an award of monetary damages in an action at law. The Court concludes that plaintiff has an adequate remedy at law and therefore the preliminary injunction requested by the plaintiff should not be granted.

See *Automated Marketing Systems, Inc. v. Martin,* 467 F.2d 1181 (10th Cir. 1972).

Upon the foregoing Findings of Fact and Conclusions of Law,

IT IS ORDERED that the plaintiff's motion for a preliminary injunction be and the same is hereby denied, and the temporary restraining order entered by the Court on the 16th day of June, 1978, is hereby dissolved as of 5:00 P.M. on this date.