**INTERNATIONAL MINERALS AND CHEMICAL CORPORATION, Plaintiff-Appellant,**

**v.**

**LLANO, INCORPORATED, Defendant-Appellee.**

**No. 83–2657.**

United States Court of Appeals, Tenth Circuit.

Aug. 9, 1985.

880

Keith A. Jones, John B. Ruhl of Fulbright & Jaworski, Washington, D.C., and James P. Houghton, Mark Thompson III of Modrall, Sperling, Roehl, Harris & Sisk of Albuquerque, N.M., for plaintiff-appellant.

Don Maddox of Maddox & Renfrow, Hobbs, N.M., and Jeron Stevens of Baker & Botts, Houston, Tex., for defendant-appellee.

Before BARRETT, DOYLE and McKAY, Circuit Judges.

BARRETT, Circuit Judge.

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed.R. App.P. 34(a); Tenth Cir.R. 10(e). The cause is therefore submitted without oral argument.

International Minerals and Chemical Corporation (IMC) brought this diversity action against Llano, Inc. (Llano), seeking a declaratory judgment that it was excused from its obligation to pay for natural gas under a contract between IMC and Llano. Llano counterclaimed for $3,564,617.12, the amount it claimed was due under the contract. The district court granted judgment in favor of Llano and against IMC. The court found that IMC had no legal excuse for non-performance, and ordered IMC to pay Llano $3,441,869.79.

IMC, a New York corporation, operates a potash mine and processing facility near Carlsbad, New Mexico. At all times relevant to this action, IMC obtained the natural gas it needed to operate its facilities from Llano. Llano is a New Mexico corporation engaged in the business of intrastate transportation of natural gas by pipeline. The natural gas contract between Llano (seller) and IMC (buyer) that is the subject of this litigation was made in 1972, and continued in effect until June 30, 1982. It was amended only once, in 1975. That amendment concerned pricing structure as set forth in paragraph 5 of the contract, and is not an issue in this case. The pertinent portions of the contract are as follows:

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties do hereby bargain, contract and agree as follows:

1. *SUPPLY OF NATURAL GAS:* Subject to the terms and conditions of this Contract, Seller will sell and deliver to Buyer and Buyer will take, purchase and pay for the entire fuel requirements of Buyer's Plant, provided that Buyer may at its option procure and maintain a supply of standby fuel to be used only to such extent as may be necessary when the gas supply from Seller may be interrupted or curtailed, as hereinafter provided, and in such other amounts as may be necessary from time to time to test such standby facilities and fuel.

\* \* \* \* \* \*

6. *DELIVERY REQUIREMENTS:* During the term of this Contract, unless Seller agrees in writing to the contrary, the minimum daily deliveries that Seller shall make to Buyer and Buyer shall take from Seller shall be 4800 million BTU's per day except as hereafter provided. The maximum daily deliveries that Seller shall be required to make to Buyer shall be 133% of the average daily requirements of Buyer's Plant for the preceding 365 days provided, however, Seller shall at no time be required to deliver in excess of 6400 million BTU's per day unless Seller agrees in writing to the contrary.

Buyer does not contemplate reducing its operations, but on the contrary contemplates the increase thereof from the present daily requirements. In order to meet unanticipated contingencies, it is agreed that in the event Buyer during the term of this Contract reduces its operation by closing a portion of its plant, it shall have the right upon six months notice in writing to reduce the minimum requirements to a figure equal to 70% of the stated minimum of 4800 million BTU's per day. In the event of such reduction in minimum requirements, Seller's price to Buyer then in effect under the terms hereof shall be increased by ½¢ per million BTU's, but not in excess of the highest price for a like quantity of gas then being paid by any potash company in the area.

7. *MINIMUM ANNUAL PURCHASE:* During the term of this Contract, commencing with the first year, Buyer agrees to take from Seller a volume of gas having a BTU content of not less than 355 times the minimum daily deliveries specified in Section 6 hereof.

Buyer agrees to pay Seller for such minimum volume of gas at the price set forth in Section 5 hereof provided that if Buyer fails during any calendar year to take such minimum volume of gas, then the deficiency between the volume actually taken and Buyer's minimum purchase obligation shall be paid at the price in effect during the calendar year in which such deficiency occurs.

Billing for any payment due by reason of a deficiency in Buyer's takings of gas hereunder during a particular calendar year shall be included on the bill rendered to Buyer for gas delivered to Buyer during the month of December in the calendar year in which such deficiency occurred and payment therefor shall be made in the manner provided for monthly bills in Section 11 hereof. Failure on the part of Seller to so bill Buyer for any such deficiency payment shall not constitute a waiver hereof by Seller.

\* \* \* \* \* \*

15. *FORCE MAJEURE:* Either party shall be excused for delay or failure to perform its agreements and undertakings, in whole or in part, when and to the extent that such failure or delay is occasioned by fire, flood, wind, lightning, or other acts of the elements, explosion, act of God, act of the public enemy, or interference of civil and/or military authorities, mobs, labor difficulties, vandalism, sabotage, malicious mischief, usurpation of power, depletion of wells, freezing or accidents to wells, pipelines, permanent closing of Buyer's operations at its Eddy County mine and refinery, after not less than six (6) months notice thereof to Seller, or other casualty or cause beyond the reasonable control of the parties, respectively, which delays or prevents such performance in whole or in part, as the case may be; provided, however, that the party whose performance hereunder is so affected shall immediately notify the other party of all pertinent facts and take all reasonable steps promptly and diligently to prevent such causes if feasible to do so, or to minimize or eliminate the

effect without delay. It is understood and agreed that settlement of strikes or other labor disputes shall be at the sole discretion of the party encountering the strike or dispute.

Nothing contained herein, however, shall be construed as preventing the Buyer from discontinuing the operation of the plant for such periods of time as may be required by Buyer to perform necessary overhaul operations on plant properties or to accomplish preventative maintenance operations on such plant properties, which the Buyer may determine as necessary to safeguard its investment in the plant.

16. *ADJUSTMENT OF MINIMUM BILL:* In the event that Seller is unable to deliver or Buyer is unable to receive gas as provided in this Contract for any reason beyond the reasonable control of the parties, or in the event of force majeure as provided in Section 15 hereof, an appropriate adjustment in the minimum purchase requirements specified in Section 7 shall be made.

(Pl.Exh. 3, Def.Exh. C8b).

■ The contract may be characterized as a requirements contract, with an important limitation: Pursuant to paragraph 6, the buyer (IMC) is obligated to take, at a minimum, a daily average of 4800 million BTU's of gas. Pursuant to paragraph 7, if the buyer does not take this minimum amount, the buyer is obligated to pay for the minimum amount of gas anyway. These provisions are known in the industry as "take or pay" provisions, the purpose of which is to compensate the seller for being ready at all times to deliver the maximum amount of gas to the buyer and to eliminate the risk that the seller would face in a pure requirements contract were the buyer's requirements to drop too low. *See, e.g., Utah International, Inc. v. Colorado—Ute Electric Association,* 425 F.Supp. 1093 (D.Colo.1976) ("take or pay" coal purchase contract); *Mobile Oil Corporation v. Tennessee Valley Authority,* 387 F.Supp. 498 (N.D.Ala.1974) ("take or pay" electricity contract). The harshness of the "take

or pay" provisions in this contract are to some extent ameliorated by the "force majeure" provision of paragraph 15 and the "adjustment of minimum bill" provision of paragraph 16; paragraphs 15 and 16 are discussed below.

At the time the contract was made, IMC operated nine submerged combustion evaporators (Ozarks) at its plant. These Ozarks were gas-fired boilers in which a mixture of water and the ores sylvinite (potassium chloride) and langbeinite (potassium magnesium sulphate) was heated. The excess water was boiled off, and the hot solution was subsequently cooled. When the solution was cooled, potassium sulfate would crystallize out of solution. This potassium sulphate was marketed commercially as a fertilizer. These Ozarks were fitted with stacks that emitted large amounts of fine particulates, resulting in air pollution.

Initially, the particulate emissions from these Ozarks were not regulated by the New Mexico Environmental Improvement Board (EIB). In December, 1978, however, the EIB promulgated Regulation 508. (Pl. Exh. 19, Def.Exh. A–23). Paragraph C of that regulation limited emissions from potash processing equipment (i.e., Ozarks) to 30 pounds per hour. Compliance was to be achieved "as expeditiously as practicable" and not later than December 31, 1982. Paragraphs D and E allowed operators the option of replacing submerged combustion evaporators (i.e., Ozarks) with alternative technology, in which case emissions were required to be reduced to 350 pounds per hour by December 31, 1982 and to 30 pounds per hour by December 31, 1984. IMC participated with the EIB in the Rule 508 rulemaking process, and was especially instrumental in getting the alternative provisions of paragraphs D and E included.

Before the promulgation of Rule 508, IMC had considered different ways to reduce the particulate emissions of the Ozarks. IMC looked at the "Venturi Scrubber," the "Brink Mist Eliminator," and the "Multiple Effect Evaporator" systems. The first two systems were designed to remove particulates from the exiting gas stream, and the latter system was designed to heat the solution in such a way that no particulates were created. Because of various technical problems with each of these alternatives [1], IMC had concluded by the end of 1978 that its best hope for achieving compliance with Rule 508 was in a solar evaporation process. Accordingly, a timely statement of intent to adopt the solar evaporation process and petition for compliance schedule were filed with the EIB on March 30, 1979. (Pl.Exh. 21). The EIB adopted a schedule of compliance for IMC on July 13, 1979. (Pl.Exh. 22). IMC experimented with the solar evaporation process for about a year, and eventually concluded that this process, too, was technically infeasible. In May, 1980, IMC sought from EIB an amended compliance schedule to give IMC a chance to experiment with a "salting out process" (SOP), whereby the potassium sulphate would be extracted from solution by chemical precipitation. (Pl.Exh. 23). An amended compliance schedule for IMC was adopted by EIB on July 11, 1980. (Pl.Exh. 25).

Meanwhile, an IMC employee notified Llano by telephone on May 21, 1980 that IMC would begin testing on June 2 and that gas consumption would be 50–60% of the normal useage during that time. This was followed by a second telephone call in August, informing Llano that testing would continue. In neither of these calls

1. IMC's general manager at the Carlsbad plant testified that the "Venturi Scrubber" had never been used in this particular way, and that because of the very fine size of the particulates there were doubts that the scrubbers could reduce emissions sufficiently to come into compliance with Rule 508. The "Brink Mist Eliminator" utilized a filter that would plug up almost immediately. The filter had to be washed with dilute sulfuric acid, which had to be neutralized with limestone. That process in turn caused a sludge problem. The "Multiple Effect Evaporator" had been used in another mine. Their experience had been that the titanium tubing used in the system would clog with langbeinite deposits in a matter of days or weeks, forcing a shutdown while the tubing was drilled clean. There were also serious corrosion and abrasion problems. R.Vol. IV at 503–512.

was Llano informed that the testing was in response to environmental problems, or that the reduced gas consumption might be permanent because of a "force majeure" situation.

IMC's tests of the SOP were successful, and on March 20, 1981, IMC advised the EIB that the SOP was commercially operational and that "IMC will be able to immediately eliminate continued use of the evaporators in the potassium sulphate manufacturing process." (Pl.Exh. 29).

The Ozarks, when they had been in operation, had consumed approximately 60% of IMC's natural gas requirements. The result of IMC's change to the SOP in response to Rule 508 was that the Ozarks were shut down and IMC did not take its minimum obligation of natural gas during the last eighteen months that the contract was in effect (January, 1981–June, 1982).

In its action for declaratory judgment, IMC claimed that it was excused from its obligation to "take or pay" under a variety of legal and equitable defenses. The trial court rejected each defense, and found that IMC was liable to pay Llano for the full value of the gas not taken (i.e., the amount of the minimum purchase obligation, less the gas actually purchased, multiplied by the purchase price per unit of gas), even though Llano had, in fact, been able to sell the gas elsewhere for a higher price than it would have received from IMC. Our focus will be on the trial court's findings with respect to the common law doctrine of impossibility/impracticability and the "force majeure" and "adjustment of minimum bill" clauses in the contract.

The trial court found that the common-law doctrine of impossibility/impracticability, as codified in Section 2–615 of the Uniform Commercial Code (N.M.Stat.Ann. § 55–2–615 (1978)), was not applicable in this case. The court found that Section 2–615, by its terms, applies only to sellers, and read Official Comment 9 to say that the section can apply to buyers only "where the buyer's contract is in reasonable commercial understanding conditioned on a definite and specific venture or as-

sumption...." The court found that such was not the case here.

With respect to the "force majeure" and "adjustment of minimum bill" paragraphs 15 and 16, the court found that these provisions did not excuse IMC from its contract obligations. These provisions would have been applicable only if the EIB regulation had prohibited absolutely IMC's daily purchase of 4800 million BTU's of gas. The court thus construed the provisions of paragraphs 15 and 16 to excuse performance only if it became absolutely impossible or illegal to purchase the minimum amount of gas. Though the court recognized that IMC had found compliance through the fitting of "scrubbers" on the Ozarks' stacks to be technically unsuitable, such a finding did not, in the court's view, help IMC. This was because IMC had voluntarily cooperated with the EIB, and had come into compliance earlier than required. IMC had therefore not done all it could to surmount the obstacles to performance, and thus could not claim that it was unable to comply for reasons beyond its control.

In this appeal, IMC contends that: (1) IMC's supervening need to comply with environmental regulations excused its duty of performance under both (a) the common law doctrine of impossibility/impracticability as codified under Section 2–615 of New Mexico's Uniform Commercial Code, and (b) the "force majeure" and "adjustment of minimum bill" provisions of the contract; (2) the "minimum payment" clause of the contract constitutes an unenforceable penalty; (3) the contract as a whole is unconscionable; and (4) the trial court incorrectly calculated the amount of damages owing in the event the contract is found to be enforceable. We consider only the two parts of IMC's first contention.

On a fundamental level, this case is one of contract construction. Our primary objective, as always, in the construction or interpretation of a contract is to ascertain the intention of the parties. *Schultz & Lindsay Construction Co. v. State*, 93 N.M. 534. 494 P.2d 612, 613 (1972); *Yankee Atomic Electric Company*

*v. New Mexico and Arizona Land Company,* 632 F.2d 855, 858 (10th Cir.1980) (interpreting New Mexico law.) We assume that the parties intended a reasonable interpretation of the language. *Smith v. Tinley,* 100 N.M. 663, 674 P.2d 1123, 1125 (1984). Accordingly, the legal context in which the contract was made will be relevant. As mentioned above, paragraphs 15 and 16 ameliorate the harshness of the "take or pay" provisions in that either party's duty of performance may be excused upon the occurrence of certain contingencies. As we examine the language of paragraphs 15 and 16, an appropriate area to look for guidance is the common law doctrine of impossibility/impracticability, codified at Section 2–615 of New Mexico's Uniform Commercial Code (N.M.Stat.Ann. § 55–2–615 (1978)), which was the law in New Mexico at the time the parties contracted and which remains the law today. While it is a basic premise of both Section 2–615 and the Uniform Commercial Code in general that the parties may allocate risks and penalties between themselves in any manner they choose, N.M.Stat.Ann. §§ 55–1–102 and 55–2–615 (1978), the Code and the common law upon which it is based remain a significant backdrop.[2]

We first consider the effect of paragraph 15, the "force majeure" provision, on IMC's duty of performance under the circumstances of this case. Specifically, Paragraph 15 provides that either party is excused from performance if failure or delay in performance is "occasioned" by such events as fire, flood, act of God, interference of civil and/or military authorities, etc. The party seeking to be excused from performance must provide the other party with immediate notice of all pertinent facts and take all reasonable steps to prevent the occurrence. It also appears that the seller is entitled to six months notice before the buyer can be excused. We agree with the trial court that paragraph 15 does not operate to excuse IMC, although our conclusion is based on a somewhat different rationale. First, IMC's notice to Llano was inadequate in that no reasons were given as to why gas consumption would be decreased. Adequate notice was required to trigger the protections of the provision. Second, even if we assume *arguendo* that Rule 508 prevented IMC from taking the gas, Rule 508 would still pose no obstacle to IMC's ability to pay. Since this is a "take or pay" contract, the buyer can perform in either of two ways. It can either (1) take the minimum purchase obligation of natural gas (and pay) or (2) pay the minimum bill. It is settled law that when a promisor can perform a contract in either of two alternative ways, the impracticability of one alternative does not excuse the promisor if performance by means of the other alternative is still practicable. *Ashland Oil And Refining Co. v. Cities Service Gas Co.,* 462 F.2d 204, 211 (10th Cir.1972); *Glidden Company v. Hellenic Lines, Limited,* 275 F.2d 253, 257 (2d Cir.1960); Restatement (Second) of Contracts § 261, comment f (1981). Paragraph 15 does not compel a different result; it would at most excuse IMC from its duty to "take," not from its duty to "pay."

---

2. Section 2–615 of the Uniform Commercial Code (N.M.Stat.Ann. § 55–2–615 (1978)) provides in pertinent part:

**55–2–615 Excuse by failure of presupposed conditions.**

Except so far as a seller may have assumed a greater obligation and subject to the preceding section ... on substituted performance:

(a) delay in delivery or nondelivery in whole or in part by a seller ... is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency, the nonoccurrence of which was a basic assumption on which the contract was made, or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid;

---

Official Comment 8 (which we regard as persuasive authority, even though it is not a part of the statute) provides *inter alia:* Generally, express agreements as to exemptions designed to enlarge upon or supplant the provisions at this section are to be read in the light of mercantile sense and reason, for this section sets up the commercial standard for normal and reasonable interpretation and provides a minimum beyond which agreement may not go.

■ Paragraph 16, the "minimum bill" provision, however, affords the buyer additional protection. It provides that, in the event the buyer is *"unable* to receive gas as provided in the Contract for any reason *beyond the reasonable control* of the parties ..." (emphasis added), then "an appropriate adjustment in the minimum purchase requirements specified in Section [paragraph] 7 shall be made." Paragraph 7, in turn, provides for a minimum bill based on the difference between the buyer's minimum purchase obligation and the gas actually taken. It follows that an adjustment of the buyer's minimum purchase requirements made pursuant to paragraph 16 would have the effect of lowering the buyer's minimum bill under paragraph 7. Llano's contention that paragraph 16 provides for a reduction in IMC's minimum purchase obligation but not its minimum bill obligation (Appellee's Brief at 4) is thus quickly disposed of.

The determinative question, then, is: Did the promulgation of Rule 508 constitute an event beyond the reasonable control of IMC that rendered IMC "unable" to receive its minimum amount of gas under the contract?

■ A simplistic, literal interpretation of the word "unable" would, in our view, be inappropriate and lead to absurd results: IMC could never be "unable" to take Llano's gas; IMC could always take the gas and vent it into the air, even if its facilities were completely destroyed. The word "unable" appears here as a term in a contract, prepared by businessmen and attorneys; thus, it is appropriate to construe the term in light of the common law as it existed in New Mexico when the contract was entered into. For our purposes, then, "unable" is synonymous with "impracticable," as that term is used in the common law and in Section 2–615.

The term "impracticable" has, over the years, acquired a fairly specific meaning. Although earlier cases required that performance be physically impossible before the promisor would be excused, strict impossibility is no longer required. *See* Restatement of Contracts (Second) § 261, comment d (1981). The New Mexico Supreme Court has described the doctrine of impracticability as follows:

Regarding the meaning of "impossibility" as used in the rules that excuse the non-performance of contracts, it is stated:

"As pointed out in the Restatement of Contracts, the essence of the modern defense of impossibility is that the promised performance was at the making of the contract, or thereafter became, impracticable owing to some extreme or unreasonable difficulty, expense, injury, or loss involved, rather than that it is scientifically impossible. * * * The important question is whether an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract. If so, the risk should not fairly be thrown upon the promisor." *Wood v. Bartolino,* 48 N.M. 175, 146 P.2d 883, 886, (1944), *quoting* 6 Williston on Contracts, § 1931.

*Cf. Gulf Oil Corporation v. Federal Power Commission,* 563 F.2d 588, 599 (3d. Cir. 1977), *cert. denied* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978) ("The crucial question in applying that doctrine to any given situation is whether the cost of performance has in fact become so excessive and unreasonable that the failure to excuse performance would result in grave injustice...."); *Mineral Park Land Co. v. Howard,* 172 Cal. 289, 156 P. 458, 460 (1916) ("a thing is impracticable when it can only be done at an excessive and unreasonable cost").

■ Performance will be excused when made impracticable by having to comply with a supervening governmental regulation. N.M.Stat.Ann § 55–2–615 (1978); Restatement of Contracts (Second) § 264 (1981). Thus, for example, in the case of *Kansas City, Missouri v. Kansas City, Kansas,* 393 F.Supp. 1 (W.D.Mo.1975), the court held that the defendant city's obligation to accept the plaintiff city's sewage

was excused by the enactment of the Federal Water Pollution Control Act Amendments of 1972. The federal act imposed new requirements with regard to the treatment of sewage that was discharged into the Missouri River; the court found that the added expense of such treatment would impose a significant, unreasonable burden on the defendant. *Accord City of Vernon v. City of Los Angeles*, 45 Cal.2d 710, 290 P.2d 841 (1955).

 Inasmuch as there was no technically suitable way for IMC to comply with the EIB's Regulation 508 without shutting down the Ozarks and changing to the SOP, with the concomitant decrease in natural gas consumption, we hold that the adjustment provision of paragraph 16 of the contract was triggered. IMC was unable, for reasons beyond its reasonable control, to receive its minimum purchase obligation of natural gas between January 1, 1981 and June 30, 1982; thus, the minimum bill should have been adjusted appropriately. IMC should not be required to pay for any natural gas it did not take under the contract.

 Llano contends that there was no supervening legal impracticability in this case because IMC was not required to be in final compliance until December 31, 1984, and that IMC cooperated with the EIB and came into compliance too early. The argument here is that, notwithstanding the interim standards contained in the schedules of compliance, IMC should have stalled in its negotiations with the state regulatory agency, which would have resulted in the pollution of air until the last minute. We must reject this contention on two grounds: First, as a matter of policy, individuals and corporations who cooperate with local regulatory agencies and comply with the letter and spirit of legally proper regulations, environmental or otherwise, are to be encouraged. Stalling tactics are not regarded favorably. Second, as a matter of law, government policy need not be explicitly mandatory to cause impracticability. Thus, for example, in *Eastern Air Lines, Inc. v. McDonnell Douglas Corporation*, 532 F.2d 957 (5th Cir.1976), an air-

craft manufacturer was excused from its contractual obligation to deliver commercial jet airliners on certain scheduled dates because it had voluntarily complied with government requests to expedite production of military equipment needed for the war in Vietnam. Similarly, in the maritime context, shipowners have been excused from contractual obligations because they have anticipated governmental intrusion. *The Kronprinzessin Cecilie*, 244 U.S. 12, 37 S.Ct. 490, 61 L.Ed. 960 (1917) (German ship was justified in returning to New York rather than completing a voyage to Great Britain and France on the eve of the outbreak of hostilities in World War I); *The Clavaresk*, 264 F. 276 (2d Cir.1920) (shipowner may anticipate and need not resist government requisition of his ship for wartime service in order to be excused from performance of a charter agreement). There is, we recognize, a limit to the extent to which an individual can seek refuge in the context of a case such as this by cooperating with the government: "any action by the party claiming excuse which causes or colludes in inducing the governmental action preventing his performance would be in breach of good faith and would destroy his exemption." Official Comment 10, N.M.Stat.Ann. § 55–2–615 (1978). Here, Regulation 508 was promulgated by the EIB as part of New Mexico's State Implementation Plan mandated by the Clean Air Act. Regulation 508's existence and its enforcement mechanism is designed to eliminate pollution of the environment, thus serving the public health and welfare. IMC's recognition of the public benefit goal and its willingness to cooperate in eliminating pollution can hardly be termed improper collusion.

For the reasons described above, the judgment of the trial court in favor of Llano is REVERSED. The case is REMANDED with direction that the court enter a declaratory judgment in accordance with this opinion.