**COLORADO INTERSTATE GAS COMPANY, a Delaware corporation, Petitioner,**

v.

**CHEMCO, INC.; Robin Investment Co., Inc.; R.E. Neher; Dempsey Investment Co., Inc.; G. Hamilton Neher; Kirchner Farm Associates; and Robert Jones, Respondents.**

No. 92SC163.

Supreme Court of Colorado, En Banc.

June 14, 1993.

Colorado Interstate Gas Co., Michael L. Williams, Rebecca H. Noecker, Colorado Springs, Robert S. Summers, Ithaca, NY, Holland & Hart, Elizabeth A. Phelan, Denver, James J. White, Ann Arbor, MI, for petitioner.

Davis & Ceriani, P.C., Gary J. Ceriani, John W. Himmelmann, Denver, Richard R.

Helmick, Kailua–Kona, HI, for respondents.

Hall & Evans, Kirk R. McCormick, Colorado Springs, for amici curiae Interstate Nat. Gas Ass'n of America, Wyoming Public Service Com'n, Public Service Co. of Colorado, Greeley Gas Co., The City of Colorado Springs.

Chief Justice ROVIRA delivered the Opinion of the Court.

We accepted certiorari to review the court of appeals decision in *Colorado Interstate Gas Co., Inc. v. Chemco*, 833 P.2d 786 (Colo.App.1991), holding that the damages awarded by the trial court were appropriate for breach of a take-or-pay provision in a natural gas contract and that the award did not violate either due process or basic principles of contract law. We affirm.

## I

Colorado Interstate Gas Company (CIG) is a natural gas pipeline that gathers gas at wells, transports it, and sells it to consumers of natural gas, generally utility companies. In 1979, as a part of a campaign to expand its gas supply, CIG entered into a long-term "take-or-pay" contract[1] to purchase natural gas from Chemco.[2] The contract provided that CIG would take, and pay for, a designated minimum quantity of gas within a contract year, or if CIG failed to take the minimum quantity of gas it would nevertheless pay for the gas it was required to, but did not, take. On paying for the gas not taken, CIG had the right for the next five years to "make-up" that gas. Although this contract initially encompassed only one well, the Wear 3–2 well, it was later amended to encompass three new wells.[3]

The market for natural gas changed dramatically after the parties entered into their agreement. In the early 1970's inadequate production, due in part to the regulatory price ceilings on natural gas sold in the interstate market, had led to gas shortages and a corresponding increase in prices to consumers. *See Mobil Oil Exploration v. United Distribution Co.*, 498 U.S. 211, 217, 111 S.Ct. 615, 620, 112 L.Ed.2d 636 (1991) ("severe shortages persisted in the interstate market because low ceiling prices for interstate gas sales fell considerably below prices the same gas could command in intrastate markets, which were as yet unregulated"); *Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 679 (10th Cir.1991) ("regulatory price ceilings on natural gas sold in the interstate market had contributed to conditions of decreased production and, ultimately ... natural gas shortages"). Congress responded to the natural gas shortage by enacting the Natural Gas Policy Act, 15 U.S.C.A. §§ 3301 to 3432 (1983 & 1993 Supp.), which "comprehensively and dramatically changed the method of pricing natural gas produced in the United States." *Public Service Comm'n, New York v. Mid Louisiana Gas Co.*, 463 U.S. 319, 322, 103 S.Ct. 3024, 3027, 77 L.Ed.2d 668 (1983). It effectuated this change by, *inter alia*, giving the Federal Energy Regulatory Commission (FERC) the ability to regulate the intrastate gas market, as well as the interstate market, and established a phased deregulation scheme for new and hard-to-produce gas. *Mobil*, 498 U.S. at 217, 111 S.Ct. at 620. The incentives for the production of new and difficult-to-produce gas resulted in the gas shortages of the 1970's turning into the surpluses of the 1980's.

In response, at least in part, to the changing market brought about by the

---

**1.** A take-or-pay clause requires

the purchaser to take, or failing to take, to pay for the minimum annual contract volume of gas which the producer-seller has available for delivery. Under such clause the purchaser usually has the right to take the gas paid for (but undelivered) in succeeding years.

Howard R. Williams & Charles J. Meyers, *Oil and Gas Terms* 750 (1981). A provision permit-

ting the purchaser to take the gas previously paid for is referred to as a "make-up" provision. *Id.* at 413–14.

**2.** For purposes of clarity, respondents will be referred to collectively as "Chemco."

**3.** Of relevance to this litigation are the Wear 1, Muir 1A, and the Mundhenke wells. Specific facts concerning the Wear 1 and the

Natural Gas Policy Act, the parties amended their agreement. Under the terms of this amendment, from October 1, 1983, through October 1, 1985, CIG's take obligation was reduced to a flat 130,000 thousand cubic feet (mcf) per year from all Chemco wells committed to the contract, rather than a percentage of the gas wells' capacity. After October 1, 1985, the 1983 amendment provided that CIG's take obligation was to be reduced from 75% of the wells' capacity, as was originally required, to 50% of the wells' capacity. Additionally, the 1983 amendment gave Chemco the right to determine which wells were to be used to produce the 130,000 mcf. At the conclusion of this two-year modification, October 1, 1985, CIG ceased to perform its obligations under the contract, exercising what it claimed to be its right to cease purchasing gas pursuant to paragraph 4.5 of the contract.[4] Concurrently, it initiated a declaratory judgment action seeking a determination that it had no obligation to purchase gas and accordingly had no take-or-pay liability. Chemco counterclaimed alleging, as relevant to this appeal, breach of the take-or-pay clause prior to October 1, 1983, and subsequent to October 1, 1985. Pursuant to a stipulation between the parties, trial of the case was bifurcated. Phase I was to be tried to the court and was to encompass "[a]ll issues framed by [CIG's] complaint for declaratory judgment, and any other issues framed by the pleadings with respect to whether [CIG] has breached the contract ·with [Chemco]...." The stipulation provided that phase II would encompass "all remaining issues framed by [Chemco's] counterclaims [and would] be tried to jury verdict."

At the conclusion of phase I, the trial court ruled that paragraph 4.5 permitted a suspension of performance only if there

was a significant depletion in Chemco's wells' capacity to produce gas. Accordingly, the trial court determined that CIG was in breach of the contract by impermissibly exercising paragraph 4.5. Shortly after the conclusion of phase I, CIG purportedly requested full resumption of performance under the contract.

At the conclusion of phase II, the damage phase, the trial court instructed the jury that it had "already determined that CIG [had] breached its contractual obligations" and that the only question to be decided by the jury was "the amount of damages suffered by Chemco as a result of CIG's breach of contract." The trial court further instructed the jury that, if they found actual damages, they should award "as such actual damages all take-or-pay payments due Chemco under the terms of the contract...." The jury awarded Chemco over $3 million in damages. The court of appeals affirmed both the finding of liability and the damages award.

## II

CIG argues that the trial court improperly instructed the jury on the measure of damages because a contract for the sale of natural gas after severance is a contract for the sale of goods.[5] It urges that because Chemco is a seller of goods its remedies should be limited to those provided by the Colorado Uniform Commercial Code (UCC), specifically section 4–2–703, 2 C.R.S. (1992). Thus, according to CIG, the proper measure of damages is the contract price for the gas, less the market price, plus incidental damages, less expenses saved. *See* § 4–2–708(1), 2 C.R.S. (1992).

### A

Long term contracts, such as the contract at issue here, are prevalent in the natural gas industry. *See* C.F.R. § 2.61(c) (1992) (requiring pipelines to insure deliverability for twelve years). Purchasers, such as pipelines and industrial consumers, make substantial investments in equipment

Mundhenke wells are set forth in Part III of this opinion.

**4.** Paragraph 4.5 of the contract provides:

Irrespective of any other provision of this Agreement, whenever the quantity of gas being delivered at any delivery point is or becomes so low that it is not economically feasi-

ble for Seller [Chemco] to deliver or Buyer [CIG] to take such gas into buyer's facilities, either party may elect to discontinue delivering or taking such gas.

**5.** *See* § 4–2–107(1), 2 C.R.S. (1992); *KN Energy, Inc. v. Western Sugar Co.,* 698 P.2d 769, 778 n. 10 (Colo.), *cert. denied,* 472 U.S. 1022, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985).

for the transportation and consumption of natural gas. Richard J. Pierce, *Natural Gas Regulation, Deregulation, and Contracts*, 68 Va.L.Rev. 63, 77 (1982) ("*Natural Gas Regulation*"). Long term supply contracts ensure supply security for these purchasers during a time of shortage, such as the shortage that occurred during the 1970's, the time during which this contract was negotiated.

Early gas contracts had no minimum take requirement, permitting the pipeline to choose the amount taken from each producer. Generally these contracts also contained an exclusive dedication clause, prohibiting a producer from seeking another purchaser for any available gas. J. Michael Medina et al., *Take-or-Litigate: Enforcing the Plain Meaning of the Take-or-Pay Clause in Natural Gas Contracts*, 40 Ark.L.Rev. 185, 190–91 (1986) ("*Take-or-Litigate*"). Thus, pipelines were able to "shut-in" wells when the demand for gas dropped, effectively utilizing the gas wells as storage reservoirs for the benefit of the pipelines. Because the demand for natural gas is the highest in the winter, many wells were shut-in during the summer, and producers received no revenue from them. Being thus deprived of revenues, the producer "was often unable to recover the substantial exploration, drilling, and operational costs associated with wells." *Take-or-Litigate, supra*, at 191.

However, the regulation of natural gas sales in interstate markets placed artificial ceilings on the price paid to producers of gas such as Chemco. These ceilings limited the negotiability of price in gas sales agreements. Thus, because supply was limited, producers sought, and obtained, other economic benefits in their supply contracts. Charles H. Arbaugh, *Take or Pay Clauses: Pandora's Box Reopened?*, 5 E.Min.L.Inst. 11–1, 11–4 to –5 (1984) ("*Pandora's Box*"). Among the favorable provisions negotiated by producers in this artificial market is the take-or-pay clause which, as an incentive for the producer's contract, became a part of the price pipelines were willing to pay to insure continued supply. *Id.* at 11–35. *See Take-or-Litigate, supra*, at 191 ("With strict price provisions in place, competing pipelines had little unique

to offer producers. Therefore, the strength of a take-or-pay provision, and the concomitant shift of market risk, was a bargaining chip that pipelines used to outbid one another.").

The take-or-pay obligation was in turn passed on to the pipeline's customers who were generally required to take a minimum amount of gas, or pay the cost of the gas not taken. Nathaniel K. Adams, *Comment, Take–Or–Pay: The D.C. Circuit Forces FERC's Hand*, 23 Land & Water L.Rev. 149, 151 (1988). In contrast to the producer/pipeline contracts, these contracts generally had no make-up provision. Take-or-pay clauses had, by the time the parties entered into the contract at issue, become the prevailing industry practice. *Transcontinental Pipe Line v. State Oil & Gas Bd.*, 474 U.S. 409, 412, 106 S.Ct. 709, 711, 88 L.Ed.2d 732 (1986). In the words of one commentator:

> [T]he "take-or-pay" provision meets the needs of the producer for a steady minimum income to pay his operating costs, taxes, and royalty, while at the same time allowing the pipeline flexibility in the operation of its system to meet periods of uneven demand caused by weather, economic conditions, etc. The small producer frequently borrows money to finance his exploration and development programs, on the security of income from his producing properties. If that income is disrupted through the shutting in of his wells for reasons over which he has no control, he may quickly find himself in serious financial difficulty. The take-or-pay provision provides important safeguards which allow such producers to stay in business.

Johnson, *Natural Gas Sales Contracts*, 34 Inst. on Oil & Gas L. & Tax'n 83, 111 (1988).

However, while the Federal Energy Regulatory Commission—which was responsible for overseeing interstate as well as intrastate natural gas markets—chose to relieve gas customers of their obligation to purchase minimum quantities of gas from pipelines, the pipelines were still bound by their contracts with producers. *Wisconsin Gas Co. v. F.E.R.C.*, 770 F.2d 1144, 1152

(D.C.Cir.1985), *cert. denied,* 476 U.S. 1114, 106 S.Ct. 1968, 90 L.Ed.2d 653 (1986). Thus, although take-or-pay provisions were a "plausible response to the gas shortages of the 1970's, this device has created significant dislocations in light of the oversupply of gas that has occurred since." *Mobil Oil Exploration v. United Distribution Co.,* 498 U.S. 211, ——, 111 S.Ct. 615, 627, 112 L.Ed.2d 636 (1991). The natural gas surplus resulting from impending deregulation, energy conservation, and new exploration rendered the take-or-pay provisions of these contracts a significant liability to natural gas pipelines. *See ANR v. Wager & Brown,* 44 F.E.R.C. ¶ 61,057 at 61,155–56 (1988).

### B

■ The contract entered into between the parties represents, in many ways, the standard industry contract. The take-or-pay provisions of the contract provide:

4.1(a) Seller agrees to sell and deliver and Buyer agrees to take and pay for, or failing to take, nevertheless to pay for Seller's interest in a minimum quantity of gas ... equal to ... 75% of each well's maximum daily sustained capability to produce....

4.2 If, during any of the Contract Years specified in Subparagraph 4.1(a) hereof, Buyer shall fail to take the gas well Contract Quantity of gas from any well, then Buyer shall pay Seller on or before the 20th day of the second month of the next following Contract Year for that quantity of gas which is equal to the difference between the said quantity and Buyer's actual takes during such period.... During the 5 years next succeeding the Contract Year in which Buyer has failed to take the gas so paid for, all gas well gas taken by Buyer from Seller which is in excess of the gas well Contract Quantity of gas for the current Contract Year shall be known as Make-up Gas and shall be delivered without charge to Buyer until such excess equals the amount of gas previously paid for but not taken; provided, Buyer shall not be permitted to make up any canceled allowable except to the extent reinstated

by duly constituted authority.... Seller agrees to refund monies to Buyer for that portion of the gas well gas previously paid for but not taken which Seller is unable to deliver as a result of any such well not being capable of producing such gas or being disconnected under any of the options granted herein.

CIG urges that the take-or-pay provision represents an alternative method of performance. We agree. However, we disagree with CIG's assertion that because the contract provides for alternative performances the remedy for its breach must be determined exclusively by the Uniform Commercial Code's remedy provisions, specifically section 4–2–708, 2 C.R.S. (1992). The parties may vary the provisions of the UCC by agreement, § 4–1–102(3), 2 C.R.S. (1992), and "may provide for remedies in addition to or in substitution for those provided" by the UCC. § 4–2–719(1)(a), 2 C.R.S. (1992). Here, the agreement creates a performance obligation, with a concomitant remedy for its breach, that allocates the risk of market demand. Accordingly, we hold that under the facts of this case the remedy for breach of the alternative performance obligation is the payment of damages equivalent to the value of the remaining performance obligation.

The take-or-pay provision allocates the risk of market demand—whether the market for gas will decrease—on the pipeline, here CIG, by providing for performance in the alternative, insuring the producer a guaranteed rate of return on its capital investment. *Natural Gas Sales Contracts, supra,* at 108. *See Universal Resources Corp.,* 813 F.2d at 80 n. 4 ("The take-or-pay clause is a promise in the Agreement, not a measure of damages after breach...."); *Associated Gas Distributors v. F.E.R.C.,* 824 F.2d 981, 1021 (D.C.Cir.1987), *cert. denied,* 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988); *Resources Investment Corp. v. Enron Corp.,* 669 F.Supp. 1038, 1041 (D.Colo.1987). As stated by the Fifth Circuit:

The purpose of the take-or-pay clause is to apportion the risks of natural gas production and sales between the buyer and seller. The seller bears the risk of production. To compensate seller for

that risk, buyer agrees to take, or pay for if not taken, a minimum quantity of gas. The buyer bears the risk of market demand. The take-or-pay clause insures that if the demand for gas goes down, seller will still receive the price for the Contract Quantity delivered each year. *Universal Resources Corp. v. Panhandle E. Pipeline Co.*, 813 F.2d 77, 80 (5th Cir. 1987).

The alternative performances are clearly stated in paragraph 4.2. CIG could take the specified minimum quantity of gas and pay for that quantity ("take-and-pay"); failing to take the specified quantity, CIG could pay for the minimum quantity of gas. Once the "take-and-pay" alternative expired with the passage of time—the contract year—the damages are no longer measured by the value of that method of performance even if that alternative would yield a smaller recovery.[6] Rather, performance becomes the monetary payment of a sum unambiguously defined by the contract "the difference between the [contract quantity] and the Buyer's actual takes." Gas Purchase Agreement, ¶ 4.2. *See* 5 *Corbin on Contracts* § 1100, at 539, 540–41 (1964) (Where a buyer has breached a contract to pay price in money, "the seller can get judgment for the amount unpaid if he has given the agreed quid pro quo."). Breach of the remaining performance obligation, here the payment of money, gives rise to liability.[7] Because the alternative is a performance obligation, it is distinguishable from the payment provisions of a liquidated damages remedy. *See International Minerals & Chemical Corp. v. Llano, Inc.*, 770 F.2d 879, 885 (10th Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1196, 89 L.Ed.2d 310 (1986); *Williston Basin Interstate Pipeline Co. v. F.E.R.C.*, 931 F.2d 948, 949 (D.C.Cir.1991). Moreover, as the Tenth Circuit has recognized, the payments made pursuant to a take-or-pay provision are not payments for the sale of gas. *Prenalta v. Colorado Interstate Gas Co.*, 944 F.2d 677, 689 (10th Cir.1991). *See ANR Pipeline Co. v. Wagner & Brown*, 44 F.E.R.C. ¶ 61,057, 61158 (1988). Any other interpretation of the contract is tantamount to rewriting the contract, reallocating the risk in a way not intended by the parties. We accordingly affirm.

### III

CIG also alleges numerous errors with respect to the damages awarded. The jury returned a special verdict awarding damages as follows:

| | Wear 3–2 | Muir 1–A | Wear 1 | Mundhenke |
|---|---|---|---|---|
| 1979–80 | $ 0 | $ 0 | $ 0 | $ 0 |
| 1980–81 | $ 47,332 | $ 0 | $ 57,586 | $ 0 |
| 1981–82 | $ 0 | $ 18,645 | $ 68,851 | $ 0 |
| 1982–83 | $ 411,795 | $ 38,613 | $ 48,730 | $ 0 |
| 1984–85 | $ 94,079 | $ 0 | $ 0 | $ 0 |
| 1985–86 | $ 602,987 | $ 23,909 | $ 52,553 | $ 239,038 |
| 1986–87 | $ 645,712 | $ 25,589 | $ 56,252 | $ 256,970 |
| 1987–88 | $ 0 | $ 140 | $ 60,233 | $ 275,661 |

6. An alternative contract may be so drawn as to limit the power of the promisor to discharge his contractual duty by performing one of the alternatives to a definite period of time, after the expiration of which only the other alternative is available to him. After the expiration of the specified period, the obligation of the promisor becomes single and the contract is no longer alternative. In cases like this, the promisee must always estimate his damages on the basis of the second alternative. His only contract right is a right to the performance of the last alternative, conditional upon the promisor's not performing the earlier alternative by the expiration of the specified period. Such a contract as this is never an alternative contract at the time of breach. 5. *Corbin on Contracts* § 1085, at 469–70 (1964).

7. Whether CIG is entitled to any recoupment or refund rights is not within the scope of the issues upon which this court granted review. Accordingly, they are not at issue in this appeal.

## A

First, with respect to the pre-October 1985 damages (those damages incurred prior to CIG's improper exercise of paragraph 4.5), CIG argues that the damages awarded should be set aside because no finding of liability was made for conduct occurring prior to October 1, 1985. *See Mitten v. Weston,* 615 P.2d 60, 61 (Colo.App.1980) (an award of actual damages cannot be made absent a threshold finding of liability). We find CIG's argument to be without merit.

Although the principal issue in phase I was whether CIG had properly exercised its termination rights under paragraph 4.5, the pre-October 1985 liability was clearly at issue. Pursuant to a stipulation between the parties all liability issues were to be tried in phase I, including Chemco's counterclaims [8] which specifically sought damages for CIG's "fail[ure] and refus[al] to either take and pay for or pay for the minimum quantity of gas for periods prior to October 1, 1983...."

Additionally, the trial court's rulings belie CIG's argument that there was no pre-October 1985 finding of liability in phase I. After phase I, the trial court ruled that "the contract claims were decided pursuant to the stipulations of the parties. Contract liability issues may not hereafter be raised." Moreover, in an order addressing the dismissal of Chemco's tort claims, the court stated that CIG "was found to have been in breach of contract for failure to honor its commitments pursuant to a gas purchase agreement." Examination of the record demonstrates that the trial court

and the parties were cognizant that Chemco's counter-claims were at issue.

## B

■ After the phase I finding of liability, CIG requested the resumption of full performance from all committed wells effective May 2, 1988. With respect to the damages arising after that date CIG challenges the jury's award of $336,034 for take-or-pay liability. In essence, CIG argues that the trial court's finding of liability cannot support those damages incurred after phase I. We reject CIG's argument. It is obvious that CIG remained liable for its impermissible exercise of paragraph 4.5 for as long as Chemco suffered damages caused by CIG's breach. This award is supported by evidence in the record and thus will not be disturbed on appeal.

## C

■ Next CIG argues that Chemco was not entitled to any recovery for the Mundhenke and the Wear 1 wells, or alternatively, that the damage awards for these wells should be limited.

The Wear 1 was originally drilled by Chevron and eventually developed a casing leak which caused water to enter the well, which had to be pumped off for the well to produce. In its first year of gas production under the contract it produced 1,619,700 cubic feet of gas. Prior to the 1983 amendment, the well produced gas which CIG bought. However, after the 1983 amendment Chemco satisfied the contract amount from the Wear 3–2 alone.[9] The 1983 amendment also obligated Chemco to connect the Mundhenke well. However, Chemco did not connect the well.

CIG argues that (1) the failure to repair the Wear 1 and to connect the Mundhenke

---

**8.** Specifically, the stipulation provided:

    1. All issues framed by [CIG's] complaint for declaratory judgment, and any other issues framed by the pleadings with respect to whether [CIG] has breached the contract with [Chemco], shall be heard and determined by the Court, sitting without a jury....
    2. After hearing all evidence offered by both parties on the declaratory judgment and con-

tract liability issues, the Court will enter its ruling on such issues. Immediately thereafter, the Court will (if necessary) empanel a jury and all remaining issues framed by [Chemco's] counterclaims will be tried to jury verdict.

**9.** The amendment permitted Chemco to choose the wells from which it would satisfy the amended contract quantity.

rendered Chemco incapable of tendering return performance with respect to those wells, (2) because the wells had no capacity to produce absent repair and connection, CIG's take obligation, which is based on capacity, is zero, (3) Chemco's actions prohibit it from proving causation, and finally (4) that Chemco's failure to connect and repair meant that there would be a total failure of return performance. All of CIG's arguments are predicated on Chemco's duty to repair and connect as a condition of CIG's liability. Because we find that Chemco had no such duty, we affirm the award of damages with respect to these wells.

There is no serious dispute about the fact that Chemco was obligated to connect the Munhenke and repair the Wear 1 wells. Thus, absent a lawful excuse, Chemco would be in breach of the parties' agreement by failing to do so. *See* 1 James J. White & Robert S. Summers, *Uniform Commercial Code*, § 3.5 at 143 (3d ed. 1988) (*"White & Summers"*). However, because the 1983 amendment gave Chemco the right to choose which wells were to be used to produce the contract quantity during the duration of the amendment, it had no duty with respect to these wells until after the expiration of that amendment. After the expiration of the 1983 amendment, CIG stated that it was exercising its right to discontinue taking gas under the contract. At that point, Chemco still had no duty to connect and repair:

> [I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.

*Restatement (Second) of Contracts*, § 237 (1981). Because CIG was in continuing material breach of the agreement, Chemco

need not needlessly expend the funds to repair and connect.

■ However, after the phase I finding of liability, CIG requested full production from all wells committed to the contract effective May 2, 1988. Chemco responded with a request for "reasonable written assurances" that CIG would "consider the contract in force and effect" and intended to "perform [CIG's] obligations under it for the remainder of its term." *See* § 4–2–609, 2 C.R.S. (1992). Absent such assurances, Chemco would not expend the money necessary to redrill the Wear 1 and connect the Mundhenke, producing from only the Wear 3–2 and the Muir 1–A. Whether Chemco had reasonable grounds for insecurity, and whether CIG's responses were adequate assurance of due performance were questions of fact for the jury:

> Whether a party has reasonable grounds for insecurity is, of necessity, a factual matter which depends upon a multitude of factors including the seller's exact words or actions, the course of dealing or performance between these particular parties and the nature of the industry.

*White & Summers, supra,* § 6–2 at 275. *See Kaiser–Francis Oil Co. v. Producer's Gas Co.,* 870 F.2d 563, 568 (10th Cir.1989) ("[N]ormally whether a party has reasonable grounds for insecurity and the adequacy of any assurance offered are factual questions."). The jury was properly instructed on a party's right to demand assurance of performance, and by finding liability necessarily reached the conclusion that CIG's assurances were inadequate.[10]

However, CIG urges us to reverse the jury's determination as a matter of law.

---

**10.** The jury was instructed as follows:

A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party, the other may demand adequate assurance of due performance and, until he receives

such assurance, may, if commercially reasonable, suspend any performance for which he had not already received the agreed return.

It is for you to determine whether Chemco had reasonable grounds to question whether CIG would perform its obligation under the contract, and, if so, whether the assurances of performance given by CIG were adequate.

First, CIG urges that Chemco sought more than adequate assurances by claiming that it was insecure so long as CIG would not agree (1) to forego an appeal from the trial court's interpretation of paragraph 4.5, (2) to forego the possible exercise of CIG's contractual right not to take Chemco's gas, and (3) to forego the right to exercise paragraph 4.5 in the future.

Chemco's demands did not "seek far more than 'adequate assurances.'" Section 4-2-609

> rests on the recognition of the fact that the essential purpose of a contract between commercial men is actual performance and they do not bargain merely for a promise, or for a promise plus the right to win a lawsuit and that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain.... Once [the seller] has been given reason to believe that the buyer's performance has become uncertain, it is an undue hardship to force him to continue his own performance.

§ 4-2-609, Comment 1, 2 C.R.S. (1992).

Next, CIG argues that it furnished assurances that were, as a matter of law, adequate. After examining the relevant correspondence between the parties we cannot say, as a matter of law, that the assurances given were adequate. CIG continually asserted that it had the right not to purchase gas, and that it might appeal the trial court's ruling to enforce that right. CIG clearly had the right to appeal the ruling. However, while it continued to assert its belief in its right to discontinue taking gas, a reasonable fact finder could determine that its assurances were inadequate. Because the jury's determination that Chemco had the right to suspend its performance is supported by evidence in the record, and is not erroneous as a matter of law, we will not disturb it.

Accordingly, the judgment of the court of appeals is affirmed.

ERICKSON, J., does not participate.